# Horsemen's Benevolent and Protective Association, Inc. *vs.* State Racing Commission.

Suffolk.   September 14, 1988. — January 9, 1989.

Present: Hennessey, C.J., Wilkins, Liacos, Abrams, Nolan, Lynch, & O'Connor, JJ.

*Controlled Substances. Racing. Search and Seizure,* Urine sample, Administrative inspection. *Constitutional Law,* Search and seizure. *Privacy.*

Requiring an individual, pursuant to State regulation, to submit a urine specimen under the supervision of a monitor and subjecting that specimen to chemical analysis constitutes a search and seizure under art. 14 of the Massachusetts Declaration of Rights. [699-700] Liacos, J., concurring.

Discussion of cases treating of the administrative search exception to the warrant requirement set forth in *Shoemaker* v. *Handel,* 795 F.2d 1136 (3d Cir.), cert. denied, 479 U.S. 986 (1986). [700-702]

This court held that, under art. 14 of the Massachusetts Declaration of Rights, the administrative search exception to the warrant requirement was not applicable to a program of drug testing by random urinalysis of licensees in the horse racing industry pursuant to a regulation adopted by the State Racing Commission. [702-704] Liacos, J., concurring. Nolan, J., dissenting. Lynch, J. dissenting.

No sufficiently compelling reason was advanced by the State Racing Commission to justify as reasonable a drug testing regulation, 205 Code Mass. Regs. § 4.57 (1986), that instituted a broad, highly invasive program of monitored random urinalysis of persons licensed by the commission under G. L. c. 128A, § 9A. [704-705] Liacos, J., was of opinion that such random specimen searches are unlawful when not based on probable cause. Lynch, J., dissenting.

A regulation of the State Racing Commission, 205 Code. Mass. Regs § 4.57 (1986), providing for drug testing through monitored urinalysis of any person licensed by the commission under G. L. c. 128A, § 9A, who was under "reasonable suspicion" of drug use, did not meet the requisites for probable cause for such testing under art. 14 of the Massachusetts Declaration of Rights. [705-706] Liacos, J., concurring. Lynch, J., dissenting.

Civil action commenced in the Supreme Judicial Court for the county of Suffolk on December 23, 1986.

On transfer to the Superior Court Department the case was heard by *George A. Sullivan, Jr.,* J., sitting under statutory authority, and was considered by him on a statement of agreed facts.

The Supreme Judicial Court granted a request for direct appellate review.

*Jamin Ben Raskin,* Assistant Attorney General, for State Racing Commission.

*Charles R. Dougherty (Marjorie Heins & William B. Forbush* with him) for the plaintiff.

*Americo A. Salini, Jr.,* for Massachusetts Teachers Association, amicus curiae, submitted a brief.

*Carol Calliotte & Joseph G. Sandulli,* for Massachusetts Coalition of Police, amicus curiae, submitted a brief.

HENNESSEY, C.J.   The plaintiff filed suit in the Supreme Judicial Court for Suffolk County seeking a declaration that the "human drug testing" regulation adopted by the State Racing Commission (commission), 205 Code Mass. Regs. § 4.57 (1986), violates the Fourth and Fourteenth Amendments to the United States Constitution, arts. 1, 10, 12, and 14 of the Massachusetts Declaration of Rights, the Massachusetts Civil Rights Act, G. L. c. 12, § 11I (1986 ed.), and the right of privacy statute, G. L. c. 214, § 1B (1986 ed.), and that the regulation's provision permitting immediate suspension of licensees who test positive or who refuse to provide a urine sample violates the procedural due process guarantees of the Fourteenth Amendment and art. 12. The regulation institutes a broad program of testing at random of persons within the class, and also of persons who are under "reasonable suspicion" of drug use. The plaintiff sought preliminary and permanent injunctions against the commission to enjoin any drug testing. A single justice of this court transferred the case to the Superior Court in Suffolk County. G. L. c. 211, § 4A (1986 ed.).

The Superior Court judge denied the plaintiff's motion for a preliminary injunction. The plaintiff appealed to a single justice of the Appeals Court. The single justice issued an injunction, enjoining the defendant from implementing the drug testing program pending submission to the Superior Court of a

statement of agreed facts and entry of judgment by the Superior Court. The parties subsequently filed a statement of facts which left open one factual issue for trial — what percentage of initially negative test results were false. The Superior Court judge, after hearing the expert testimony presented by the parties, ruled that "there was not enough evidence presented for making the requested finding of fact" and that "the whole subject of 'false-negatives' . . . is speculative." The judge decided the case strictly on the basis of the statement of agreed facts.

The Superior Court judge ruled that the drug testing program violates the Fourth Amendment and permanently enjoined the commission from coercing its licensees to submit to the urine testing. Only the defendant appeals. We granted its application for direct appellate review. We agree with the result reached by the Superior Court judge. However, we need not consider this case in the context of the Fourth Amendment, because we now conclude that the drug testing program, in both the testing at random and on "reasonable suspicion," is unconstitutional under art. 14 of the Massachusetts Declaration of Rights.[1] We cite and make reference to Fourth Amendment cases only by way of analogy.

The summary of relevant facts is taken from the statement of agreed facts and its supplement. The plaintiff, the Horsemen's Benevolent and Protective Association, Inc. (association), is a national nonprofit organization which strives to protect the interests of trainers and owners of thoroughbred horses, and their employees, with respect to the establishment of proper rules and conditions in the horse racing industry. The Massachusetts-New Hampshire division of the association has approximately 4,000 members who are owners or trainers of thoroughbred horses which compete in races the commission licenses and regulates.

---

[1] The plaintiff asserts its rights under the Constitution because action by a State agency is shown, in contrast to *Bally* v. *Northeastern Univ., post* 713, 717 (1989), where no State action is alleged or shown, and where Bally as a consequence claimed relief by alleging violations of his rights under the Massachusetts Civil Rights Act and the right of privacy statute.

The commission has the authority, pursuant to G. L. c. 128A (1986 ed.), to regulate horse and dog racing in Massachusetts. The commission's powers include the prescription of "rules, regulations and conditions under which all horse . . . races at horse . . . racing meetings shall be conducted." G. L. c. 128A, § 9. See G. L. c. 128A, § 9A.

In 1986, the commission promulgated the "human drug testing" regulation, 205 Code Mass. Regs. § 4.57 (1986) (see Appendix), and issued a "human drug testing policy and procedure" to be followed in enforcing the drug testing regulation. The commission instituted its drug testing program based on its determination that it serves the best interest of racing to deter the use of illegal drugs at Massachusetts race tracks, and that the use and abuse of illegal drugs by licensees, whether on or off licensed premises, jeopardizes and compromises the safety of the participants, as well as the integrity of the industry. The commission had received information from Suffolk Downs's security and commission personnel regarding drug abuse at the Suffolk Downs race track. The efforts of the commission and the State police to investigate drug abuse through conventional means had proved unsuccessful. The parties agree that lay personnel could detect and recognize behavioral changes — tardiness, decrease in workload, and absences — as evidence of possible drug or alcohol abuse.

The regulation prohibits any licensee, while on racing grounds, from having present within his or her system, any controlled substance, as listed in 21 U.S.C. § 812, Schedules I-V (1982), or any wrongfully obtained prescription legend drug. The regulation provides that any licensee — owner, trainer, veterinarian, blacksmith, stable employee, jockey, jockey's apprentice or agent — may be subject to urinalysis based either on reasonable suspicion, or on random, without cause, selection. The parties define "reasonable suspicion" as "the existence of reasonable circumstances, reports, information or reasonable direct observation . . . lead[ing to the belief] . . . that a licensee is using illegal drugs." Although the regulation provides that any licensee is subject to random testing or testing based on reasonable suspicion, the policy allows, and, in prac-

tice, the commission has conducted, testing only on days that a licensee is "actively participating" in a race. Refusal to provide a sample results in immediate suspension of the licensee for thirty days; readmittance is conditioned on proof of a negative test result.

For the random testing, the stewards place the names of all licensees involved in that day's racing program into a bag. Representatives of the Jockey's Guild and the association are present for the random selection of licensees and are allowed to inspect the names of the pool of licensees. The stewards then notify the persons chosen, by telephone or the public address system at the track, to report to the security office.

The testing procedure is similar for random testing and for testing based on "reasonable suspicion." When each licensee arrives at the security office, a steward gives him or her a bottle with a number and a tag affixed to it and directs the licensee to the bathroom to produce a urine sample. The regulation states that all samples "shall be collected in the presence of a Commission Steward or . . . designee." 205 Code Mass. Regs. § 4.57(6) (1986). The policy provides, with respect to random testing, that a State trooper, inspector, or designee accompany the licensee while the sample is given and "take every precaution to avoid tampering or counterfeit samples." It states further that a licensee should be afforded maximum privacy, with the designated person remaining outside the bathroom, unless there is reason to believe that the licensee may tamper with the sample. If, however, the testing is based on "reasonable suspicion," the policy requires that the sample be given "in the presence of" a State trooper or a commission inspector, or both. Under the drug testing program as administered by the commission, a plainclothes State trooper and a racing inspector stand outside the bathroom for both random and "reasonable suspicion" testing.

The commission sends the sample in a sealed envelope, with the signatures of the licensee and the commission official on the attached evidence tag, to the commission's laboratory. The laboratory screens each urine sample using thin layer chromatography for the presence of numerous controlled sub-

stances, including cocaine, marihuana, amphetamines, and morphine; the laboratory does not screen for the presence of barbiturates or other "hypnotics" unless specifically instructed to do so.

After an initial positive indication of the presence of a controlled substance, the laboratory then conducts thin layer chromatography and gas chromatography/mass spectrometry (gc/ms) to confirm the initial positive test result. Only a confirmed positive test result is treated as positive. The laboratory does not confirm initial negative test results. The parties disagree, and the Superior Court judge was unable to determine, what percentage of initial negative results are false, inaccurately indicating an absence of controlled substances in urine samples which, in fact, do contain one or more controlled substances.

The gc/ms screening is approximately 99% accurate, absent human or mechanical error. The gc/ms test does not, however, eliminate the possibility of false positives due to inaccurate adjustment of the mass spectrometer, contaminated instruments, temperature changes, insufficient skill or training of the laboratory technicians, or problems with the validity or chain of custody of the sample. The laboratory, however, tunes the mass spectrometer daily and verifies that the instruments are not contaminated.

A positive test result for the presence of a controlled substance does not establish that a licensee was intoxicated or otherwise physically or mentally impaired at the time that the licensee gave the urine sample. A person's urine may test positive for the presence of marihuana for several weeks after ingestion although marihuana intoxication endures for not more than two hours. Similarly, a person's urine may test positive for the presence of cocaine even two or three days after ingestion although cocaine intoxication endures for less than one hour. A positive test result does not establish that an individual is addicted or drug dependent. In fact, a positive test result for the presence of marihuana may be caused by mere exposure to marihuana smoke, i.e., passive inhalation.

A positive test result may lead to immediate suspension "pending the outcome of a hearing" if it is deemed to be in

the best interest of racing to do so. If, after a hearing, a licensee is determined to have had a controlled substance in his or her system, he or she must submit to a "professional evaluation." If the professional evaluation reveals that the licensee is addicted or that his or her condition is detrimental to the best interest of racing, the licensee will not be allowed to participate in racing until he or she produces a negative test result and proof of successful completion of a certified drug rehabilitation program approved by the commission, and must agree to further testing at the discretion of the stewards or commission representative to ensure that the licensee is no longer impaired. If the evaluation does not show that the licensee is addicted or detrimental to the best interest of racing, the licensee is allowed to continue to participate in racing, provided he or she produces a negative test result, and agrees to further testing.

After a second violation, a licensee will be suspended and allowed to enroll in a certified drug rehabilitation progam approved by the commission. The licensee will be reinstated only if the commission, after a hearing, determines that licensing the person is not detrimental to the best interest of racing. If reinstated, the licensee is subject to testing indefinitely.

Between December 8, 1986, and January 12, 1987, when the commission was implementing the regulation and before it was enjoined from doing so, the commission required four licensees to provide a urine sample on the basis of "reasonable suspicion," three of whom tested positive — one for the presence of marihuana, and two for the presence of cocaine. The stewards randomly selected eleven licensees for testing, four of whom tested positive — three for the presence of marihuana, and one for the presence of marihuana and cocaine. Each licensee who tested positive was immediately suspended, and given a hearing which confirmed the suspension the same day.

We address the constitutionality of the regulation under art. 14. Because we conclude that the regulation violates art. 14, we do not address the association's claims under the Fourth Amendment, the Massachusetts Civil Rights Act, G. L. c. 12 § 11I, the right of privacy statute, G. L. c. 214, § 1B, or the procedural due process guarantees of the Fourteenth Amendment and art. 12.

403 Mass. 692          699

Horsemen's Benevolent & Protective Association, Inc. *v.* State Racing Commission.

Requiring an individual to submit a urine specimen, under the supervision of a monitor,[2] and subjecting that specimen to chemical analysis constitutes a search and seizure for constitutional purposes under art. 14. Almost every court that has addressed this issue has determined that urinalysis is a search and seizure which implicates the Fourth Amendment's protection of an individual's expectation of privacy. See, e.g., *Lovvorn v. Chattanooga*, 846 F.2d 1539, 1544 (6th Cir. 1988); *Railway Labor Executives' Ass'n v. Burnley*, 839 F.2d 575, 579-580 (9th Cir.), cert. granted, 486 U.S. 1042 (1988); *Everett v. Napper*, 833 F.2d 1507, 1511 (11th Cir. 1987); *Jones v. McKenzie*, 833 F.2d 335, 338 (D.C. Cir. 1987); *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 176 (5th Cir. 1987), cert. granted, 485 U.S. 903 (1988); *McDonell v. Hunter*, 809 F.2d 1302, 1307 (8th Cir. 1987); *Spence v. Farrier*, 807 F.2d 753, 755 (8th Cir. 1986); *Smith v. White*, 666 F. Supp. 1085, 1089 (E.D. Tenn. 1987); *Capua v. Plainfield*, 643 F. Supp. 1507, 1513 (D.N.J. 1986). But see *Turner v. Fraternal Order of Police*, 500 A.2d 1005, 1009-1011 (D.C. 1985) (Nebeker, J., concurring) (stating that urine collection is similar to voice and handwriting exemplars which are not within an individual's expectation of privacy). Similarly, art. 14 protects personal privacy and dignity against unwarranted intrusion.

Urination is one of the most private of all activities. "The subjective expectation of privacy felt by many individuals when urinating is undoubtedly one that society is prepared to consider reasonable." *Lovvorn, supra* at 1542-1543. "Most people describe [urination] by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom." *Von Raab, supra* at 175.

---

[2] The policy requires monitored urination only in the case of testing based on reasonable suspicion, or when there is reason to believe that an individual may tamper with the urine specimen. Under the procedure implemented by the commission, authorized officials stood outside the bathroom door. We judge the regulation on its face.

Moreover, an individual has reasonable expectations of privacy regarding the information which can be extracted from a urine specimen. *American Fed'n of Gov't Employees, Council 33* v. *Meese*, 688 F. Supp. 547, 551 (N.D. Cal. 1988), citing *Railway Labor Executives' Ass'n* v. *Burnley*, 839 F.2d 575, 580 (9th Cir. 1988). "One does not reasonably expect to discharge urine under circumstances making it available to others to collect and analyze in order to discover the personal physiological secrets it holds." *McDonell* v. *Hunter*, 612 F. Supp. 1122, 1127 (S.D. Iowa 1985), aff'd as modified, 809 F.2d 1302 (8th Cir. 1987). See *Penny* v. *Kennedy*, 846 F.2d 1563, 1566 (6th Cir. 1988) (stating that one can reasonably expect that his or her urine will not be exposed to sophisticated chemical analysis providing an abundance of personal information).

Urinalysis may disclose, in addition to the presence of drugs, other personal information — whether a person is taking medication for depression or epilepsy, is suffering from diabetes, or, in the case of a woman, is taking birth control pills, or is pregnant. *Von Raab*, *supra* at 175-176.

Having concluded that urinalysis constitutes a search and seizure under art. 14, we must determine whether the commission's program constitutes an unreasonable search and seizure. The regulation authorizes random testing, as well as testing based on individualized suspicion. We first discuss the random testing.

Ordinarily, a search and seizure must be accompanied by a search warrant issued on probable cause. *Commonwealth* v. *Tarver*, 369 Mass. 302, 306 (1975). *Commonwealth* v. *Pignone*, 3 Mass. App. Ct. 403, 410 (1975) (stating that warrantless searches are per se unreasonable). See *New Jersey* v. *T.L.O.*, 469 U.S. 325, 340 (1985); *Coolidge* v. *New Hampshire*, 403 U.S. 443, 454-455 (1971). A limited number of exceptions to the warrant requirement do exist. See, e.g., *Commonwealth* v. *Helme*, 399 Mass. 298, 302-303 (1987) (discussing plain view exception); *Commonwealth* v. *Brillante*, 399 Mass. 152, 156 (1987) (search incident to arrest exception); *Commonwealth* v. *Gliniewicz*, 398 Mass. 744, 749-750 (1986)

(inventory search exception); *Commonwealth* v. *Ford*, 394 Mass. 421, 426-427 (1985) (storage search exception); *Commonwealth* v. *Huffman*, 385 Mass. 122, 124-127 (1982) (exigent circumstances). See also *T.L.O.*, *supra* at 340, quoting *Almeida-Sanchez* v. *United States*, 413 U.S. 266, 277 (1972) (Powell, J., concurring).

The commission, in its argument to this court, relies heavily on the administrative search exception to the warrant requirement as applied to the random drug testing of jockeys in *Shoemaker* v. *Handel*, 795 F.2d 1136 (3d Cir.), cert. denied, 479 U.S. 986 (1986). In *Shoemaker*, the court upheld the random drug testing by urinalysis of officials, jockeys, trainers, and groomers, under the administrative search exception. The court based its decision on what it found to be a strong State interest, coupled with a reduced justifiable privacy expectation in the heavily regulated horse racing industry.

Several courts have distinguished, criticized, and rejected the *Shoemaker* decision. *Penny* v. *Kennedy*, *supra* at 1566 (rejecting *Shoemaker*). *Lovvorn*, *supra* at 1544-1547 (criticizing and rejecting *Shoemaker*, referring to its approach as "simplistic and intellectually indefensible"). *Burnley*, *supra* at 584-585 (distinguishing *Shoemaker*). *National Fed'n of Fed. Employees* v. *Carlucci*, 680 F. Supp. 416, 431 n.3 (D.D.C. 1988) (distinguishing *Shoemaker*). *Policemen's Benevolent Ass'n* v. *Washington Township*, 672 F. Supp. 779 (D.N.J. 1987) (distinguishing *Shoemaker*), rev'd, 850 F.2d 133 (3d Cir. 1988). *Taylor* v. *O'Grady*, 669 F. Supp. 1422, 1442 (N.D. Ill. 1987) (distinguishing *Shoemaker*). *Feliciano* v. *Cleveland*, 661 F. Supp. 578, 591 (N.D. Ohio 1987) (distinguishing *Shoemaker*). *American Fed'n of Gov't Employees* v. *Weinberger*, 651 F. Supp. 726, 734-735 (S.D. Ga. 1986) (distinguishing and criticizing *Shoemaker*). *Capua* v. *Plainfield*, 643 F. Supp. 1507, 1515 (D.N.J. 1986) (distinguishing *Shoemaker*). *Fraternal Order of Police, Newark Lodge No. 12* v. *Newark*, 216 N.J. Super. 461, 469 (1987) (distinguishing *Shoemaker*). *Caruso* v. *Ward*, 133 Misc. 2d 544 (Sup. Ct. 1986) (distinguishing *Shoemaker*, and noting that *Shoemaker* may be "simply out of step with the rest of the authorities"), aff'd, 131 A.D.2d 214 (N.Y. 1987).

702                                 403 Mass. 692

Horsemen's Benevolent & Protective Association, Inc. *v.* State Racing Commission.

Few courts have followed the *Shoemaker* decision, and then only in areas involving security and public safety. *National Treasury Employees Union* v. *Von Raab,* 816 F.2d 170, 179-180 (5th Cir. 1987) (analogizing customs service officials to a highly regulated industry). *McDonell* v. *Hunter,* 809 F.2d 1302, 1308 (8th Cir. 1987) (correction officers). *Rushton* v. *Nebraska Pub. Power Dist.,* 653 F. Supp. 1510, 1524-1525 (D. Neb. 1987) (nuclear power plant employees), aff'd, 844 F.2d 562 (8th Cir. 1988).

We now join those courts that have criticized and rejected the *Shoemaker* decision. The administrative search exception to the warrant requirement historically has applied to the search of premises, not individuals. *Taylor* v. *O'Grady, supra* at 1442. See, e.g., G. L. c. 94C, § 30 (1986 ed.) (administrative inspections of pharmacies); *Commonwealth* v. *Lipomi,* 385 Mass. 370, 380 (1982) (discussing requirements of warrantless administrative searches of commercial property); *Commonwealth* v. *Accaputo,* 380 Mass. 435, 438-439 (1980) (business premises of pharmacies); *Commonwealth* v. *Cadoret,* 15 Mass. App. Ct. 654, 657-659 (1983) (warrantless inspections of social clubs). See also *New York* v. *Burger,* 482 U.S. 691, 707 (1987) (administrative inspection of commercial property at automobile junkyard); *Donovan* v. *Dewey,* 452 U.S. 594, 598-599 (1981) (inspections of underground mines); *United States* v. *Biswell,* 406 U.S. 311, 313-317 (1972) (inspection of firearms dealer's premises). The permission granted to conduct warrantless administrative searches stems from a reduced "expectation of privacy that the owner of *commercial property* enjoys" (emphasis added). *Donovan* v. *Dewey, supra.* The doctrine exists, with its relaxed standard, "because the inspections are [not] personal in nature." *Lovvorn, supra* at 1546, quoting *Camara* v. *Municipal Court,* 387 U.S. 523, 537 (1967).

Even if we assume, which we do not, that the United States Court of Appeals for the Third Circuit properly decided the *Shoemaker* case under the Fourth Amendment, we must diverge from that court's analysis on the basis of art. 14 of the Massachusetts Declaration of Rights. We have previously stated that

art. 14, in some circumstances, affords more substantive protection to individuals than prevails under the Fourth Amendment. *Commonwealth* v. *Blood*, 400 Mass. 61, 67-75 (1987). *Commonwealth* v. *Ford*, 394 Mass. 421, 426 (1985). *Commonwealth* v. *Upton*, 394 Mass. 363, 373-374 (1985).

We reject the argument that random drug testing in an industry can be justified solely by, or hinges on, the extent to which that industry is heavily regulated. See *Penny* v. *Kennedy*, 846 F.2d 1563, 1566 (6th Cir. 1988); *Lovvorn* v. *Chattanooga*, 846 F.2d 1539, 1545 (6th Cir. 1988).[3] The more important inquiry, under an art. 14 analysis, focuses on an individual's reasonable expectations of privacy which are not necessarily dependent on the amount of regulation in a particular industry.

General Laws c. 128A, §§ 9 and 9A, govern horse and dog racing in the Commonwealth, granting the commission power to regulate horse and dog races. G. L. c. 128A, § 9. Section 9A addresses licensing, registering, uniform fees, names, colors, partnership agreements and specifically enumerates personnel requirements — fingerprinting and wearing a photograph badge. G. L. c. 128A, § 9A. The commission also has the power "to search the person, or enter and search the build-

---

[3] The dissenters in this case rely on the fact that racing is a heavily regulated industry. This approach, if it were sound, would logically permit random drug testing of participants in the following heavily regulated industries where the State interest, as in the case of racing, is in protecting the integrity of the industry: *Opinion of the Justices*, 401 Mass. 1211, 1219 (1987) (savings banks); *Nationwide Mut. Ins. Co.* v. *Commissioner of Ins.*, 397 Mass. 416, 424 (1986) (automobile insurance industry); *Johnson* v. *Martignetti*, 374 Mass. 784, 793 (1978) (all major aspects of the liquor industry); *Massachusetts Ass'n of Independent Ins. Agents & Brokers, Inc.* v. *Commissioner of Ins.*, 373 Mass. 290, 295 (1977) (insurance industry); *Commonwealth* v. *Eagleton*, 402 Mass. 199, 202-207 (1988) (automobile body shops and used car lots). Are employees of these several heavily regulated industries, if the State monitoring agencies should so decide, to be subjected to random drug testing by urinalysis, in the face of State interests which have nothing to do with public health and safety? We think not. Compare *Railway Labor Executives' Ass'n* v. *Burnley*, 839 F.2d 575 (9th Cir. 1988) (railroad employees involved in accidents); *Lovvorn* v. *Chattanooga*, *supra* at 1546-1547 (irretrievable catastrophe). We express no opinion at this time as to the result we would reach if we were confronted with a case in which the State interest concerned such public safety considerations.

ings, stables, room, vehicles or other places . . . [on] the grounds." 205 Code Mass. Regs. § 4.17 (27). This statutory scheme does not diminish the reasonable expectations of privacy that all licensees have in urinating and in the chemical content of their urine.[4]

Having decided that the commission's drug testing program does not fall under the administrative search exception, as interpreted under art. 14, we assess the reasonableness of the regulation by balancing the commission's need to conduct a random search against the invasiveness of the search and seizure. See *Commonwealth* v. *Shields*, 402 Mass. 162, 164 (1988). See *O'Connor* v. *Ortega*, 480 U.S. 709, 719 (1987), quoting *United States* v. *Place*, 462 U.S. 696, 703 (1983). See *Lovvorn, supra* at 1543; *Penny* v. *Kennedy*, 846 F.2d 1563, 1566 (6th Cir. 1988); *Jones* v. *McKenzie*, 833 F.2d 335 (D.C. Cir. 1987); *National Fed'n of Fed. Employees* v. *Weinberger*, 818 F.2d 935 (D.C. Cir. 1987).

The commission advances as its justifications for the drug testing regulation its desire to deter the use of illegal drugs in Massachusetts race tracks, and its concern that the use and abuse of illegal drugs by licensees, whether on or off licensed premises, compromises the safety and integrity of the industry. Such laudable concerns cannot justify random drug testing because the testing reaches too far into the personal lives of the licensees. Urine screening probes into an individual's private life as surely as if the commission were to enter a licensee's home to search for illegal drugs. See *Feliciano* v. *Cleveland*, 661 F. Supp. 578, 586 (N.D. Ohio 1987). A positive test result for the presence of drugs does not indicate drug impairment at the time the urine specimen was taken, i.e., a race day. In fact, a test result can indicate the use of marihuana or cocaine long after the drug effects have worn off.

---

[4] The association has not argued that the commission lacks authority to promulgate the "human drug testing" regulation, including the provision for the random drug testing of all licensees. We do not suggest by our silence on this unargued question that the commission has such authority by implication. See *Life Ins. Ass'n* v. *Commissioner of Ins., ante* 410, 413-418 (1988).

403 Mass. 692    705

Horsemen's Benevolent & Protective Association, Inc. *v.* State Racing Commission.

One court has suggested that random drug testing might be allowed to protect society against "irretrievable catastrophic losses," i.e., lost lives. *Lovvorn* v. *Chattanooga*, 846 F.2d 1539, 1546-1547 (6th Cir. 1988). See *Rushton, supra* at 1524 (discussing the propriety of drug testing nuclear plant employees). The commission seeks to prevent improperly won or lost horse races, certainly not irretrievable catastrophes.

The commission must advance a sufficiently compelling reason to justify the highly invasive monitored urine specimen collection it seeks to impose on all licensees. The deterrence, safety, and integrity arguments fail. Random drug testing cannot be utilized to ensure the integrity of betting on horse races, nor to serve safety or deterrence values which are merely speculative, and have no basis in the record. Compare *Commonwealth* v. *LaFrance*, 402 Mass. 789, 792-793 (1988) (upholding search of probationer and her premises on basis of "reasonable suspicion" because of public need to supervise offender for rehabilitation and compliance); *Shields, supra* at 164 (minimally intrusive roadblock search justified by carnage caused by drunk drivers). Compare also *McDonell* v. *Hunter*, 809 F.2d 1302, 1308-1309 (8th Cir. 1987) (upholding "reasonable suspicion" drug testing of correction officers); *Capua* v. *Plainfield*, 643 F. Supp. 1507, 1517 (D.N.J. 1986) (requiring "reasonable suspicion" for the drug testing of fire fighters and police department employees).

Just as in the case of random testing, the regulation's provision for testing of any person under "reasonable suspicion" of drug use must also fail. The regulation here merely requires a belief based on report, information, observation, or even "reasonable circumstances." These vague terms allow impermissibly broad discretion to the stewards, and are an invitation to arbitrary and discriminatory choice of subjects for testing. See *Commonwealth* v. *McGeohegan*, 389 Mass. 137, 143 (1983). A vague definition of "reasonable suspicion" could prove more malignant to individual rights than properly conducted random testing.

In the circumstances of this case, a regulation providing for testing on reasonable suspicion must contain the requisites of

probable cause. Thus, there must be facts and circumstances sufficient to warrant a prudent person's belief that a licensee more probably than not has used illicit drugs. See *Commonwealth* v. *Upton*, 394 Mass. 363, 370 (1985). This belief must be based on reliable, specific objective facts. Some factors that may affect the reasonableness of the suspicion include the nature of the tip or information, the reliability of the informant, the degree of corroboration, and other facts contributing to the belief. See *Commonwealth* v. *Upton, supra* at 374, 375.[5]

We conclude that, in the circumstances of this case, art. 14 prohibits random (without cause) drug testing by urinalysis of licensees under the human drug testing regulation. Drug testing upon "reasonable suspicion," as now described and defined in the regulation is also prohibited under art. 14. A provision for drug testing upon reasonable suspicion could be constitutionality valid under art. 14 only if, by specific wording and as applied, the requisites of probable cause are met.

*Judgment affirmed.*

LIACOS, J. (concurring). I write separately to indicate my reasons for joining in the result the court reaches in this case. Also, I think it important to express my disagreement with some of the reasons given by the court for its decision. First, I agree with the court's conclusion that both random testing and testing on "reasonable suspicion," as provided in the regulations of the State Racing Commission, are barred by art. 14 of the Massachusetts Declaration of Rights. My agreement is based on my concurrence with the view that "[r]equiring an individual to submit a urine specimen, under the supervision of a monitor, and subjecting that specimen to chemical analysis constitutes a search and seizure for constitutional purposes under art. 14." *Ante* at 699. I believe, further, for the reasons

---

[5] Even though we refer to the same probable cause requisites that would be required for a search warrant, we are discussing here only the possible consequences of suspension of a licensee's privileges, and not the possible criminality of his conduct.

403 Mass. 692                                       707

Horsemen's Benevolent & Protective Association, Inc. *v.* State Racing Commission.

stated in my separate opinion in *Commonwealth* v. *Shields*, 402 Mass. 162, 169 (1988), that the reason that such drug specimen searches, whether on "reasonable suspicion" or at random, are unlawful is that they are not based on probable cause. See *id*.[1] Thus, I eschew the court's unnecessary reliance in this case on "balancing" public interests against privacy interests to justify its result. As I pointed out in *Shields*, such an approach is fundamentally flawed. Additionally, if such an approach was "sui generis," as the court said it was in *Shields*, *supra* at 167, the resurrection of this concept in this case portends the accuracy of my concerns in *Shields* that to engage in a balancing approach is dangerous to fundamental art. 14 values. See *Shields*, *supra* at 174, 176 (Liacos, J., dissenting). It is enough, I think, to conclude that, absent some type of probable cause (and perhaps a warrant or an exigency excusing its absence), general searches of individuals are barred by our State Constitution.

NOLAN, J. (dissenting). The court today has extended the reach of art. 14 to prohibit drug testing of all licensees of the State Racing Commission. This is regrettable and not at all required by art. 14.

Historically, the racing industry has been a closely regulated industry. The public interest is significantly high. It does not require much imagination to grasp the mischief which can be produced by licensees under the influence of drugs.

The court strains (unpersuasively, I believe) to remove this case from the well-recognized exception to the warrant requirement in administrative searches. The search here is limited "in time, place, and manner." *Commonwealth* v. *Blinn*, 399 Mass. 126, 129 (1987). The comprehensive regulatory scheme requires testing to be carried out on the licensed premises. All licensees have been informed of the testing. Under all these

---

[1] I agree with the court's reasoning and rejection of Justice Nolan's reliance on the "closely regulated industry" approach and also with the rejection of Justice Lynch's claim that racetrack personnel have no reasonable expectation of privacy.

conditions, it is plainly wrong to conclude that the regulation invades a licensee's reasonable expectation of privacy in contravention of his rights under art. 14.

For these reasons, I dissent.


LYNCH, J. (dissenting). For some inexplicable reason it is more acceptable to the court to stop without cause or suspicion and seize average citizens in the course of their lawful activities, *Commonwealth* v. *Trumble*, 396 Mass. 81, 98 (1985) (Lynch, J., dissenting, with whom Liacos, J., joins), *Commonwealth* v. *Shields*, 402 Mass. 162, 169 (1988) (Liacos, J., dissenting, with whom Lynch, J., joins), than it is for a State agency charged with the duty to regulate horse and dog racing to test for the presence of controlled substances those individuals whose activities are already closely and legally scrutinized. In order to reach this curious result, the court applies the balancing test of *Commonwealth* v. *Trumble, supra,* so aptly criticized by Justice Liacos in his dissent in *Commonwealth* v. *Shields, supra.*

In so doing, the court examines the reasonable expectation of privacy of jockeys and other licensees of the State Racing Commission (commission) in both the act of urination and the chemical content of their urine. The court bolsters its conclusion by focusing on the fact that the act of urination is ordinarily done in private in order to justify balancing the scales in favor of protecting the privacy interest. This focus is not only mid-Victorian in tone ("'[m]ost people describe [urination] in euphemisms if they talk about it at all,'" *ante* at 699), but also is misdirected. All that is at stake is the expectation of having one's urine free from chemical analysis for the presence of drugs, not the expectation of privacy during urination. This is so because the monitoring of the act of urination that takes place (having a trooper stand outside the bathroom) is no more of an intrusion on privacy than that which occurs every day at busy restaurants and public functions, if indeed the public facilities are constructed with such solicitude for the sensitivities of the patrons as to permit this degree of privacy.

I see no reason why certain individuals, who must be licensed in order to carry on their activities and are required to be fingerprinted and wear identification badges, should be afforded a greater expectation of privacy than patrons of a busy restaurant in downtown Boston. Thus, it is only the manner in which the Commonwealth gathers its information, i.e., urinalysis, that should concern us. It is in this context that the court should determine whether the procedure is too intrusive to be deemed reasonable. See *McDonell* v. *Hunter*, 809 F.2d 1302, 1308 (8th Cir. 1987), which is relied upon by the court, and which upheld uniform and random urinalysis of correction officers because, if properly administered, it is not so intrusive as a strip search or a blood test.

The cases cited by the court which discuss the expectation of having one's urine free from chemical analysis do so in the context of holding that "urinalysis" constitutes a search and seizure. However, the issue before us is not whether urinalysis constitutes a "search and seizure" (which it surely is), but rather whether it passes scrutiny under the balancing test the court fashioned in *Commonwealth* v. *Trumble*, *supra*. The court's focus on the potential chemical secrets contained in a person's urine is beside the point. All that this case involves is a test for the presence of certain illegal drugs.

On the other hand, the pervasive harmful influence of drugs on contemporary society cannot seriously be denied. It presents a social problem of at least equal magnitude to operating a motor vehicle under the influence of alcohol. The Legislature has determined that racing is an activity that can be conducted in this Commonwealth only under carefully prescribed and limited circumstances. Racing is therefore much different from other licensed activities which are carried on by large segments of the population. In view of the problems drug use entails in contemporary society, it is clear that the Commonwealth has a compelling interest in requiring that activities which can be conducted only under its aegis will not be permitted without reasonable assurance that they are free from the pernicious influence of illegal drugs.

I would, therefore, balance the scales to permit the random testing by urinalysis of any licensee who could be reasonably expected to have some influence on the integrity of racing. I do not abandon the view of the dissents in *Trumble* and *Shields*. I would willingly sacrifice the drug testing of jockeys for the right of citizens to be free from warrantless seizure absent probable cause or reasonable suspicion. Since I do not have that option, the illusive standards of the court's balancing test lead me to a contrary result.

In addition, I note that the court rejects the concept of testing on the basis of reasonable suspicion, although all the decisions relied on by the court in rejecting random testing have upheld testing based upon reasonable suspicion and have not required probable cause. See, e.g., *Railway Labor Executives' Ass'n* v. *Burnley*, 839 F.2d 575, 589 (9th Cir. 1988); *Feliciano* v. *Cleveland*, 661 F. Supp. 578, 587-590 (N.D. Ohio 1987); *Capua* v. *Plainfield*, 643 F. Supp. 1507, 1516 (D.N.J. 1986). See also *Guiney* v. *Roache*, 686 F. Supp. 956, 959 (D. Mass. 1988) (upholding reasonable suspicion testing while rejecting random urinalysis for members of the Boston police department). I see nothing on the record before us that requires the rejection of all testing based on reasonable suspicion. I therefore respectfully dissent.

APPENDIX TO THE OPINION OF THE COURT.

"Human Drug Testing" Regulation

205 Code Mass. Regs. § 4.57 (1986)

(1) No person licensed by the Massachusetts State Racing Commission, while on the grounds of a licensed racing asssociation, shall have present within his/her system any controlled substances as listed in Schedule I through V of the U.S. Code, Title 21 (Food and Drug Section 812) or any prescription legend drug unless such prescription legend drug was obtained directly, or pursuant to valid prescription of order from a duly licensed physician who is acting in the course of his/her professional practice. It will be the responsibility of the licensee to notify the Stewards when requested to do so, on forms provided if they are using any prescription drug.

(2) The Stewards or any person designated by the Massachusetts State Racing Commission who as a result of information received, report, or personal observation reasonably suspects that a licensee present on the grounds of a licensed association may have present in his/her system any of the controlled substances mentioned in 205 CMR 4.57(1), shall direct said licensee to deliver a urine specimen to the Commission Steward, or his designee. Said licensee will produce the urine sample without undue delay and may at the discretion of the Commission Steward be required to produce a blood sample taken by a licensed physician or nurse, if unable to produce a urine sample within a reasonable time.

(3) The Stewards, or any person designated by the Massachusetts Racing Commission shall randomly, by lot, at times determined by the Commission, select licensees for drug testing. The Stewards or the Commission designee shall direct said licensee to deliver urine specimen to the Commission Steward, or his designee within a reasonable time.

(4) The Stewards, if they reasonably suspect that a licensee may be impaired in any way because of drugs or alcohol, shall prohibit said licensee from participating in the day's racing until such time as the licensee produces evidence of a negative drug test result, or pending the outcome of a drug test, appears before the Stewards and is no longer impaired.

(5) Refusal by said licensee to provide the urine sample shall be a violation of these rules and subject said licensee to immediate suspension. The Stewards, after a hearing, shall suspend for thirty days any licensee who refuses to provide a urine sample. At the conclusion of the thirty day suspension, the licensee will not be re-admitted until he/she produces evidence of a negative test result, acceptable to the Stewards.

(6) All urine samples collected at the direction of the Stewards or the Racing Commission designee shall be collected in the presence of a Commission Steward or his designee and will be sealed and identified by said Steward or designee and remain under their control and custody until the sample is transported to the Racing Commission Laboratory for analysis. The sample will be identified by attaching an evidence tag thereto signed by the licensee and the Racing Commission Official witnessing the collection sample.

(7) If after a hearing a licensee is in violation of this rule as a result of a positive test, he/she shall not be allowed to participate in racing until such time as his/her condition has been professionally evaluated to the satisfaction of the Racing Commission.

> (a) After such professional evaluation, if said licensee's condition proves non-addictive and not detrimental to the best interest of racing, said licensee shall be allowed to participate in racing provided he/she can produce a negative test result and agrees to further testing at the discretion of the Stewards or designated Racing Commission representatives, to insure said licensee is no longer using drugs.

(b) After such evaluation, if said licensee's condition proves addictive or detrimental to the best interest of racing, said licensee shall not be allowed to participate in racing until such time as he/she can produce a negative test result and show documented proof to the satisfaction of the Stewards that he/she has successfully completed a certified drug rehabilitation program approved by the Racing Commission. Said licensee must agree to further testing at the discretion of the Stewards or Racing Commission representative to insure said licensee is no longer impaired.

Positive test results will be reported to the Chairman of the Racing Commission and the Commission Steward who will immediately notify the licensee and schedule a hearing.

A licensee may be suspended pending the outcome of a hearing if it is in the best interest of racing to do so. If after a hearing, a licensee is determined to be in violation of this rule he/she will have their license suspended until such time as they comply with 205 CMR 4.57(7) and (8).

(8) For a licensee's second violation, he/she shall be suspended and allowed to enroll in a certified drug rehabilitation program approved by the Racing Commission. Said licensee will only be reinstated if the Commission, after a hearing, determines that licensing said person is not detrimental to the best interest of racing. If reinstated, said licensee will be subjected to indefinite testing.