Gants, J.
The plaintiff, Donovan Harrison (“Harrison”) has filed suit against his employer Eldim, Inc. (“Eldim.”), its corporate parent — Interturbine Group of Companies (“Interturbine”), and his immediate supervisor — Donald Larsen (“Larsen”), alleging that they interfered with his right to privacy, in violation of G.L.c. 214, §1B, by compelling him to give a urine sample for drug analysis after he sought medical attention following a work-related accident.[1] The defendants have now jointly moved for summary judgment on this last remaining count of the complaint. After hearing and for the reasons stated below, the defendants’ joint motion for summary judgment is ALLOWED.

BACKGROUND

In evaluating a motion for summary judgment, I must rely on facts not in dispute as well as disputed facts viewed in the light most favorable to the nonmov-ing party. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995). Consequently, the facts stated below are presented in the light most favorable to the plaintiff and should not be misunderstood as findings of the Court.
Harrison was employed by Eldim from November 13, 1995 through February 21, 1996. Before he was hired, Harrison was told that he had to be drug-free to work at Eldim. In December 1995, while still a probationary employee, Harrison took and passed a drug test, and consequently became a permanent employee.
As an Eldim employee, Harrison made parts for machines that make disposable diapers. Among the machines he used was a corrugator that would cut metal into multiple strips and bend the strips into a shape suitable to form a honeycomb design. Safety mattered a great deal in using the corrugator, because a worker could lose his hand if he allowed it to get caught in the machine. Loose clothes were a problem near this machine because they could get pulled into the machine. Harrison admitted at his deposition that, *154 if a worker were not properly concentrating when working on this machine, he “could feed the machine too much, get piled up, jam up the machine, . . . get hurt.” He also admitted that it would create a safety risk if someone under the influence of drugs or alcohol were using the corrugating machine.
On February 10, 1996, Harrison suffered a deep cut on his thumb while pulling out a fine metal screen with a sharp edge. He showed the cut to Larsen, who told him to bandage it up and get back to work. After working for another 20 to 25 minutes, Harrison noted that the cut was still bleeding enough that it had saturated the gauze and risked dripping on the product. Eventually, Larsen agreed to let Harrison go to the Health Stop, a medical facility contracted to provide medical services for Eldim employees, to have the cut looked at by a doctor.
When Harrison arrived at Health Stop, the receptionist asked him if his supervisor wanted him to take a drug test. Harrision did not know, so the receptionist telephoned Larsen, who told her to perform a drug test. Under the Drug Abuse and Testing policy then in place at Eldin:
Drug screening maybe required following any work related accident or any violation of safety precautions or standards, whether or not an injury resulted from such accident or violation. Testing will be conducted on employees whose performance either contributed to an accident or cannot be completely discounted as a contributing factor to an accident. Post Mishap Testing must occur as soon as possible but not later than 32 hours after the accident. Post accident testing is authorized for accidents as defined in 49 C.F.R. 830.2.[2]
Interturbine H.R. Policy 702, dated May 1, 1990 and revised Sept. 1, 1990.
A doctor looked at his hand and gave him a butterfly stitch. Then a nurse came in with a cup. She told him to squirt dye into the toilet and not to flush it or run any water. She then walked him into the bathroom and told him to fill the cup as much as he could with urine. She then left the bathroom, leaving the door open a crack, and stood outside the door listening to hear if he was following her instructions. He then initialed tapes and plastic bags intended to show that it was his urine being sent for testing.
A few days later, Harrison received a telephone call from a woman at the laboratory informing him that he had tested positive for marijuana. She told him the test scores indicated that he had been smoking marijuana for a long time. She explained that they had divided the urine into two units, A and B and had tested the A unit three times, with each test reading positive for marijuana. She gave him the name of a doctor he should call about the test scores.
Later that night, Harrison telephoned this doctor. The doctor asked Harrison why he was smoking marijuana and Harrison denied having used marijuana. The doctor offered to test the B sample to see if that confirmed the positive test, and Harrison told him he was crazy. The doctor told him he was going to inform the company that Harrison had tested positive for marijuana.
The next day, when Harrison arrived at work, he was told that he was fired and had to leave the premises. That day or the next day, Harrison spoke with Eldim’s general manager, Felix Twaalfhoven, who urged him to get the B sample tested. Harrison told him that he did not want the B sample tested but was instead going to get his own drug test done to prove that the February 10 test had been a false positive. Twaalfhoven asked Harrison to inform him of the results.
Harrison took another drug test, which he personally paid for, on February 27, and the results of this test were negative. He went back to Twaalfhoven with these new results, but Twaalfhoven would not give him his job back.

DISCUSSION

To prevail on summary judgment, the moving party must establish that there is no genuine issue of material fact on every element of a claim and that it is entitled to judgment on that claim as a matter of law. See generally Mass.R.Civ.P. 56(c); Highlands Insurance Co. v. Aerovox, Inc., 424 Mass. 226, 232 (1997). Where, as here, the party opposing summary judgment has the burden of proof at trial, the moving party is entitled to summary judgment if it “demonstrates, by reference to material described in Mass.R.Civ.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party’s claim.” Id. It is sufficient to demonstrate that “proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).
G.L.c. 214, §1B provides, “A person shall have a right against unreasonable, substantial or serious interference with his privacy.” In evaluating whether Eldim’s drug testing of Harrison constituted an “unreasonable, substantial or serious interference” with Harrison’s privacy, this Court must balance Eldim’s legitimate business interest with Harrison’s interest in privacy. Folmsbee v. Tech Tool Grinding & Supply, Inc., 417 Mass. 388, 392-93 (1994); Webster v. Motorola, Inc., 418 Mass. 425, 431-32 (1994).
On the employer side of the balance, the general interest of all businesses “in protecting the safety of their employees and in providing them a drug-free environment in which to work,” is not sufficient by itself to justify the invasion of privacy inherent in *155 requiring an employee to submit to urinalysis. Webster v. Motorola, Inc., 418 Mass. at 433. To justify such an invasion, the employer must show that, if the employee were to use controlled substances, the safety of its employees, customers, or others maybe at significant risk, or there may be a significant risk of corporate liability or of damage to property. Webster at 433; Folmsbee v. Tech Tool Grinding & Supply, Inc., 417 Mass. at 393. There is no material factual dispute that Harrison’s work at Eldim was sufficiently dangerous that he risked serious injury to himself and to others, and to the machine, if he were using it while under the influence of drugs.
On the employee side of the balance, the Supreme Judicial Court has recognized “that requiring an employee to submit to urinalysis involves a significant invasion of privacy.” Folmsbee at 392; Webster at 431. Three privacy concerns must be considered. First, “(t]he act of urination is inherently private.” Folmsbee at 393; Webster at 431. The invasion of privacy is greatest when a medical assistant must watch the employee urinate, least when the employee urinates in the privacy of the bathroom and simply submits the urine sample to the medical assistant. See Folmsbee at 393. Here, the evidence is undisputed that Harrison was allowed to urinate without being watched, although the bathroom door was left slightly ajar so that the nurse could listen to him urinating and ensure that he did not run the faucet, flush the toilet, or somehow tamper with the urine sample.
Second, “individuals have a privacy interest in what may be detected through urine testing.” Webster at 431. “Urinalysis may disclose, in addition to the presence of drugs, other personal information — whether a person is taking medication for depression or epilepsy, is suffering from diabetes, or, in the case of a woman, is taking birth control pills, or is pregnant.” Horsemen’s Benevolent & Protective Association, Inc. v. State Racing Commission, 403 Mass. 692, 700 (1989). There is no evidence that the urine test here was used to look for anything other than controlled substances.
Third, “to the extent that it may be requested to rebut an initial positive test result, information concerning an employee’s medical conditions is also within the realm of one’s privacy interest.” Webster at 431. In this case, the only information about medical conditions that was sought from Harrison after his positive test was whether he had glaucoma or cataracts. In view of the nature of Harrison’s work, the employer would have been justified, wholly apart from a positive drug test, in asking Harrison whether he had glaucoma or cataracts since these conditions may substantially affect his vision and poor vision could pose serious safety problems in the workplace.
Harrison seeks to add some additional considerations to the balance. He notes that the Supreme Judicial Court, in balancing the competing interests in Folmsbee, found the drug testing there to be reasonable in part because of that employer’s prior problems with employee drug use. Folmsbee at 394. He contends that the absence of any evidence of employee drug use at Eldim shifts the balance here and makes the drug testing an unreasonable invasion of privacy. This Court does not find that an employer need have a drug problem in the workplace before he can institute drug testing to prevent such a problem. Given the prevalence of drugs in our society, if the safety needs of the workplace are so substantial as to justify drug testing, an employer does not need to wait for a tragedy to occur before it can take the steps necessary to ensure a drug-free workplace.
Harrison also argues that Eldim’s policy permitting drug screening of employees following any work related accident is not limited to those employees in safety-sensitive positions. Harrison is correct that, under the language of the so-called “Post Mishap Testing” policy, Eldim could require a secretary with a paper cut to undergo drug testing just as surely as it could require drug testing of a machinist injured while operating a corrugator. However, in balancing the competing interests in an invasion of privacy claim, this Court must balance those interests as applied to the plaintiff, not as applied to any employee. That is why the Supreme Judicial Court in Webster could find that the interests of the employer in drug testing were sufficient to outweigh the privacy interests of the account executive who drove a company-owned car thousands of miles per year, but were not sufficient to outweigh the privacy interests of the technical editor. Webster at 432-33. Eldim’s “Post Mishap Testing” policy may indeed constitute an invasion of privacy as applied to the secretary with a paper cut, but need not as applied to Harrison. Indeed, with an employee in safety-sensitive positions, it is reasonable to conduct drug testing after workplace accidents, since the accident itself may have been caused by the use of a controlled substance. See Skinner v. Railway Labor Executives’ Association, 489 U.S. 618 (1999) (finding mandatory drug testing of railway employees who are involved in certain train accidents to be reasonable without a showing of individualized suspicion).
Finally, Harrison seeks to add to the balance the fact that Eldim fired him based solely on the positive results of the February 10, 1996 test, and ignored the negative results of the February 27, 1996 test. This argument is beyond the scope of an invasion of privacy claim, which is limited to the loss of privacy involved in being forced by an employer to give a urine sample which is then tested for controlled substances. The termination of his employment based on a positive test result is not itself an invasion of privacy. It may, in some circumstances, constitute a breach of contract, but the plaintiff has voluntarily dismissed his breach of contract claim in this case, perhaps because the *156 plaintiff was admittedly an employee at will, who could be fired for any reason except those few prohibited by law.
In short, the legitimate business interest of Eldim justifies the post-accident drug testing of an employee in Harrison’s position to ensure that his work performance was not impaired by controlled substances, and the procedures employed in this case by Eldim did not invade Harrison’s privacy any more than was inherent in drug testing itself. While the balancing of interests involves a factual inquiry, Webster at 434, this Court, viewing the evidence in the light most favorable to the plaintiff, finds as a matter of law that the plaintiff “has no reasonable expectation of proving” that the drug testing as applied to Harrison was an unreasonable interference with his privacy. See Kourouvacilis v. General Motors Corp., 410 Mass. at 716. Therefore, this Court must allow the defendants’ joint motion for summary judgment.

ORDER

For the reasons stated above, the defendants’ joint motion for summary judgment is ALLOWED.

The plaintiff also alleged breach of contract in the second count of his complaint, but he has voluntarily dismissed this count, leaving his invasion of privacy claim in Count One as his sole remaining claim.

 49 C.F.R. §830.2 defines only aircraft accidents, and makes no sense in the context of this policy. The plaintiff asks this Court to read this policy literally, so that it applies only to work related accidents that occur while an employee is aboard an airplane. This Court declines to give it this nonsensical meaning, and instead interprets the policy as if the word “accidents” was left undefined. Indeed, even if read literally, the policy declares only that post-accident testing is authorized for aircraft accidents; it does not provide that post-accident testing is only authorized for aircraft accidents.