ROBERT T. GUINEY[1] *vs.* POLICE COMMISSIONER OF BOSTON.

Suffolk. September 5, 1991. - December 9, 1991.

Present: LIACOS. C.J., WILKINS. ABRAMS. NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ

*Search and Seizure,* Urine sample. *Constitutional Law,* Search and seizure. *Privacy. Controlled Substances. Police,* Urine testing.

A rule issued by the police commissioner of Boston concerning the testing of Boston police officers for the use of illicit drugs constituted, insofar as the rule prescribed random urinalysis testing of police officers, an unreasonable search and seizure violative of art. 14 of the Massachusetts Declaration of Rights, where no consent to the searches was contemplated by the rule, and where the commissioner failed to show at least a concrete, substantial governmental interest that would be well served by imposing random urinalysis on the police officers. [330-334] LIACOS, C.J., concurring. NOLAN, J., dissenting. LYNCH, J., dissenting. O'CONNOR, J., dissenting.

CIVIL ACTION commenced in the Superior Court Department on December 22, 1989.

The case was heard by *Barbara A. Dortch,* J., on a motion for summary judgment.

The Supreme Judicial Court granted a request for direct appellate review.

*Frank J. McGee* for the plaintiff.

*Kevin S. McDermott,* Special Assistant Corporation Counsel, for the defendant.

WILKINS, J. In April, 1986, the defendant police commissioner issued Boston Police Department Rule 111 (Rule 111) concerning the testing of Boston police department personnel for the use of illicit drugs. Rule 111, as now amended, authorizes urinalysis drug testing of police officers both on reason-

---

[1]Individually and as he is the president and representative of the Boston Police Patrolmen's Association, Inc.

able suspicion and on a random basis. In this action, the plaintiff, a Boston police officer, relying solely on art. 14 of the Massachusetts Declaration of Rights, challenges the constitutionality of the random testing proposed by Rule 111.

The plaintiff in no respect relies on the Constitution of the United States. Any claim of a violation of the Fourth Amendment seems foreclosed by the determination in *Guiney* v. *Roache*, 873 F.2d 1557, 1558 (1st Cir.), cert. denied, 493 U.S. 963 (1989). That court held, in light of *National Treasury Employees Union* v. *Von Raab*, 489 U.S. 656 (1989), that Rule 111, to the extent that it calls for random testing of those police officers who carry firearms or participate in drug interdiction, does not prescribe any search or seizure in violation of a police officer's Fourth Amendment rights.[2] *Guiney* v. *Roache*, *supra* at 1558.

A judge of the Superior Court ruled that the random urinalysis provisions of Rule 111 did not violate art. 14. She, therefore, allowed the commissioner's motion for summary judgment and dismissed the action. We granted the commissioner's petition for direct appellate review. We reverse and direct that summary judgment be entered declaring that Rule 111 violates art. 14 insofar as Rule 111 prescribes random urinalysis testing of Boston police officers.

The factual record before us by stipulation is the same as that before the Federal Court and consists of Rule 111, as amended, and nothing else of significance. Rule 111, as amended, appears in *Guiney* v. *Roache*, 654 F. Supp. 1287, 1289-1294 (D. Mass. 1987).[3] The details of Rule 111 are not

---

[2] A Federal District Court judge had ruled before the release of the *Von Raab* opinion and of *Skinner* v. *Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989), that the procedures of Rule 111 violated Fourth Amendment rights to the extent that Rule 111 directed random urinalysis tests to be conducted. *Guiney* v. *Roache*, 686 F. Supp. 956, 964 (D. Mass. 1988), vacated 873 F.2d 1557 (1st Cir. 1989). For earlier aspects of the case in the Federal Court, concerning abstention, see *Guiney* v. *Roache*, 654 F. Supp. 1287 (D. Mass.), vacated and remanded 833 F.2d 1079 (1st Cir. 1987).

[3] As now further amended, Rule 111 does not apply to civilian employees of the department.

important for our purposes. Any police officer to be tested, except on the basis of reasonable suspicion, "will be selected by randomized independent computer process." *Id.* at 1291. Rule 111, if followed, thus eliminates any prospect of an improper exercise of discretion to test a particular police officer.

Rule 111 states that the rule is necessary to preserve the "integrity of the Department and its personnel; to guard against the harmful consequences to the public good occasioned by the unauthorized unlawful use" of drugs by law enforcement personnel; and to "maintain a high degree of public confidence in all those charged with upholding public order and public safety." *Id.* at 1290. There is nothing in the record to indicate that there has been any problem, or any public perception of a problem, arising from the illicit use of drugs by Boston police officers. Indeed, there is nothing in the record to indicate that Boston police officers have unlawfully used controlled substances on or off duty. Moreover, there is no showing of how random drug testing by urinalysis will provide information that is needed to identify officers whose on-duty performance was affected by illicit drug use.

The commissioner rightly concedes that the random urinalysis testing called for by Rule 111 involves a search and seizure for the purposes of art. 14. See *O'Connor v. Police Comm'r of Boston,* 408 Mass. 324, 326 (1990); *Horsemen's Benevolent & Protective Ass'n, Inc.* v. *State Racing Comm'n,* 403 Mass. 692, 699-700 (1989). The question is whether the unannounced, warrantless, suspicionless, random urinalysis testing procedure that Rule 111 imposes is an *unreasonable* search and seizure under art. 14. If such an intrusive testing process could ever be justified as reasonable in an art. 14 sense (barring the police officer's consent to the testing), the government would have to make a strong factual showing that a substantial public need exists for the imposition of such a process applicable to all police officers.

We have considered challenges to drug test requirements before. In *Horsemen's Benevolent & Protective Ass'n, Inc.* v. *State Racing Comm'n, supra* at 705, this court concluded that art. 14 prohibited random drug testing by urinalysis,

pursuant to a drug testing regulation, of persons licensed by the State racing commission. The commission claimed that the testing program deterred drug use, ensured the integrity of betting on horse races, and encouraged safety. The court rejected these arguments because they "are merely speculative, and have no basis in the record." *Id.* The commission failed to meet its burden of advancing "a sufficiently compelling reason to justify the highly invasive monitored urine specimen collection it seeks to impose on all licensees." *Id.* Justice Greaney, writing in concurrence in *O'Connor* v. *Police Comm'r of Boston, supra* at 332 (Greaney, J., concurring), made the same point with respect to the record in that case. "[T]he important constitutional right of privacy established by art. 14" should not be overruled by "abstract goals of safety and integrity . . . without any factual information in the record to demonstrate frequency of drug use by police officers or to demonstrate any connection between such use and grave harm to the force or public safety."

In the *O'Connor* case, which concerned the testing of police cadets for drug usage, the police cadet had consented to the search, and, therefore, he had little or no reasonable expectation of privacy. In such circumstances, the generalized but undocumented governmental need for the search — discovering and deterring drug use by police cadets — made the search, in the court's view, reasonable under art. 14. Three concurring Justices concluded that the cadet's consent alone made the search reasonable under art. 14 and that either no balancing of public interests against privacy interests should ever be undertaken in a case like this (*id.* at 332 [Liacos, C.J., concurring])[4] or that, because of the cadet's consent, no balancing of interests was needed (*id.* at 332 [Greaney, J., concurring, joined by Liacos, C.J., and Abrams, J.]).

In the case before us, no consent to the searches is contemplated by Rule 111, and the commissioner has made no dem-

---

[4]This view was expressed by Justice Marshall in his dissent in *Skinner* v. *Railway Labor Executives' Ass'n, supra* at 635, 636-641 (Marshall, J., dissenting, joined by Brennan, J.).

onstration, on the record or otherwise, that facts exist that warrant random drug tests of police officers. The record offers nothing to show that there is a drug problem in the Boston police department. Nor is there anything outside the record of which we could take note that would permit such a conclusion. There is also no fact in the record, or otherwise established, to which the commissioner points to show that a substantial public purpose requires and justifies random testing of the urine of Boston police officers. In striking down the random search aspect of Rule 111, Judge Keeton reached the conclusion that the record before him (which is the record before us) was inadequate to support the government's position. *Guiney* v. *Roache*, 686 F. Supp. 956, 961 (D. Mass. 1988). The commissioner's argument is speculative.

By contrast, in *Commonwealth* v. *Trumble*, 396 Mass. 81 (1985), where the court upheld the use of roadblocks (conducted pursuant to carefully crafted guidelines) to deter and detect drunk drivers, there was a clear demonstration that drunk motorists presented a substantial problem on the highways of this State. *Id.* at 86-87. Although the stopping of a motorist's vehicle at a roadblock is a seizure for constitutional purposes (*Commonwealth* v. *McGeoghegan*, 389 Mass. 137, 139 [1983]), the intrusion of a roadblock on a motorist's privacy is fleeting and certainly does not involve the random taking of body fluids. This court has never approved the nonconsensual taking of blood or urine of a person in the absence of a demonstrated, particularized basis for doing so.

The court should not infer or assume the existence of facts that might justify the governmental intrusion. The reasonableness of a mandated urinalysis cannot fairly be supported by unsubstantiated possibilities. If the government is to meet the requirements of art. 14, it must show at least a concrete, substantial governmental interest that will be well served by imposing random urinalysis on unconsenting citizens.[5] In

---

[5]Whatever may be the rule under the United States Constitution in similar circumstances (see *American Federation of Government Employees* v. *Skinner*, 885 F.2d 884, 894 [D.C. Cir. 1989], cert. denied, 495 U.S. 923 [1990]), the government under art. 14 has the burden to show that the

such a case, the justification for body searches, if there ever can be one, cannot rest on some generalized sense that there is a drug problem in this country, in Boston, or in the Boston police department and that random urinalyses of police officers will solve, or at least help to solve, the problem or its consequences. We reject the view of the majority of the Justices of the Supreme Court that such proof is not required because "[i]t is sufficient that the Government have a compelling interest in preventing an otherwise pervasive societal problem from spreading to the particular context." See *National Treasury Employees Union* v. *Von Raab, supra* at 675 n.3.[6]

Thus, whether one rejects the balancing of interests test as a standard for protecting art. 14 rights or whether one might apply such a test on a proper showing of a compelling reason for nonconsensual random drug testing, Rule 111 violates art. 14 to the extent that it purports to authorize random searches. Constitutional safeguards should not be abandoned simply because there is a drug problem in this country. Arti-

---

standards of art. 14 are met. See *Horsemen's Benevolent & Protective Ass'n, Inc.* v. *State Racing Comm'n*, 403 Mass. 692, 705 (1989); *Commonwealth* v. *Shields*, 402 Mass. 162, 164 (1988). Usually that means, for art. 14 purposes, that the government must demonstrate probable cause for the search and seizure, and that the search must have been pursuant to a search warrant, absent some exception to the warrant requirement. Under the random testing aspect of Rule 111, there can be neither a search warrant nor probable (or any other specific) cause, because the search is a random one.

[6]Justice Scalia dissented in *National Treasury Employees Union* v. *Von Raab, supra* at 680, 681 (Scalia, J., dissenting, joined by Stevens, J.), because the government failed to demonstrate (1) the frequency of the use of alcohol and drugs by United States Customs Service employees and (2) the connection of such uses to harm. In that case, the court held that the Customs Service did not violate the Fourth Amendment by requiring a urinalysis test from each employee who seeks transfer or promotion to certain positions. Justice Scalia pointed out that "[w]hat is absent in the Government's justifications — notably absent, revealingly absent, and as far as I am concerned dispositively absent — is the recitation of *even a single instance* in which any of the speculated horribles actually occurred: an instance, that is, in which the cause of bribetaking, or of poor aim, or of unsympathetic law enforcement, or of compromise of classified information, was drug use." *Id.* at 683.

cle 14 of the Declaration of Rights should not be a casualty in the war on drugs. It is at times when pressures on constitutional rights are greatest that courts must be especially vigilant in the protection of those rights.

The judgment is reversed. Summary judgment shall be entered for the plaintiff declaring that, on the record before the court, the random testing of urine purportedly authorized by Boston Police Department Rule 111 would violate the rights under art. 14 of the Massachusetts Declaration of Rights of any police officer ordered to be tested.

*So ordered.*

LIACOS, C.J. (concurring). I join the court in rejecting as unconstitutional Boston Police Department Rule 111's authorization of random, mandatory urinalysis for Boston police officers. The facts of the present case differ sharply from those in *O'Connor v. Police Comm'r of Boston*, 408 Mass. 324, 332 (1990) (Liacos, C.J., concurring), where I concurred with this court's decision that mandatory urinalysis for a police cadet did not constitute an unreasonable search and seizure. The keystone of my concurrence in *O'Connor* was the fact that the plaintiff cadet had consented to submit to mandatory urinalysis. *Id.* The present case, however, involves no such consent.[1]

While I concur with the result reached in this case, I must reiterate my concern with this court's willingness to consider the "balance" of public interests against privacy interests in determining the constitutionality of searches and seizures. See *O'Connor v. Police Comm'r of Boston, supra* at 332 (Liacos, C.J., concurring); *Horsemen's Benevolent & Protective Ass'n, Inc. v. State Racing Comm'n*, 403 Mass. 692, 706 (1989) (Liacos, J., concurring). Notwithstanding its allusion

---

[1] A question arises as to whether an employer constitutionally can require an employee to consent to mandatory urinalysis as a condition of employment. Because the facts of the present case do not involve this scenario, I reserve my opinion on this issue for a more appropriate case.

to the laws of physics, and their concomitant certainty and precision, a "balancing" test subjects the constitutional right against unreasonable searches and seizures to a standard only slightly more enduring than the latest public opinion poll. It is my firm belief that the use of these tests, no matter how well-intended, will result in the eventual dissolution of this precious constitutional right. The focus of the constitutional analysis must remain on the issue whether reasonable cause exists to justify the particular search and seizure at issue. See *Commonwealth* v. *Shields*, 402 Mass. 162, 169 (1988) (Liacos, J., dissenting).

NOLAN, J. (dissenting). Once again a majority of this court has found some hidden meaning within article 14 of the Massachusetts Declaration of Rights to deviate from a decision of the United States Supreme Court in a question concerning the Fourth Amendment to the United States Constitution. See *Commonwealth* v. *Amendola*, 406 Mass. 592 (1990); *Commonwealth* v. *Blood*, 400 Mass. 61 (1987). My disagreement with this approach has been made clear. See *Commonwealth* v. *Amendola*, *supra* at 602 (Nolan, J., dissenting); *Commonwealth* v. *Blood*, *supra* at 78 (Nolan, J., dissenting).

What is of paramount concern today is that the majority opinion is totally devoid of any standard used to deviate from the position of the Supreme Court. This court has characterized that area where art. 14 and the Fourth Amendment diverge as a "special category," and one that should apply to a particular situation only if there is some "compelling reason" to do so. *Commonwealth* v. *Cast*, 407 Mass. 891, 907 (1990). In this case, the plaintiff failed to present any coherent rationale for this court to disagree with the Supreme Court.[1] If

---

[1] In making his argument on this point, it is noteworthy that the plaintiff argued in these terms: "[S]ociety is no more willing now, than it was when the Fourth Amendment and Article 14 were written and adopted," to accept random drug testing of police officers. The plaintiff failed to articulate

we are to allow such a divergence, surely we should insist on a "compelling reason" to do so.

Also conspicuous by its absence in the majority opinion is any reference to the history of art. 14. It is well-established that the Fourth Amendment derives from our own art. 14. *Harris* v. *United States*, 331 U.S. 145, 161 (1947) (Frankfurter, J., dissenting); N.B. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 82 (1937). It is also well-established that Massachusetts adopted art. 14, as a result of the colonists' experiences with British officials, to protect the public from public officials. *Commonwealth* v. *Blood*, 400 Mass. 61, 71 (1987). It is doubly ironic, therefore, that the majority today reaches a conclusion which not only is at odds with the Fourth Amendment but also undermines an effort by the public to protect itself once again from the abuses of public authorities.

Even if it were expedient for this court to ignore the Supreme Court's interpretation of the Fourth Amendment and decide this case purely on art. 14 grounds, the majority's reasoning is unpersuasive. In assessing the reasonableness of any search or seizure, "we must balance the public interest against 'the individual's right to personal security free from arbitrary interference by law officers.'" *Commonwealth* v. *Trumble*, 396 Mass. 81, 86 (1985), quoting *United States* v. *Brignoni-Ponce*, 422 U.S. 873, 878 (1975). In performing this balancing test, it is implicit that each situation should be judged on its own merits, and that there are instances in which a reasonable expectation of privacy, which would normally outweigh the public interest, has less weight.

That is the case in the present action where it is without question that police officers, as police officers, have an expectation of privacy that is less than that of private citizens. Our General Laws contain numerous provisions that reflect the unique status of police officers within our Commonwealth.

---

any special circumstances that differentiate art. 14 from the Fourth Amendment in this case.

See G. L. c. 31, § 58 (age and height requirements); c. 41, § 96 (appointment of police officers); c. 41, § 108L (career incentive pay program); c. 41 § 111F (leave without loss of pay); c. 147, §§ 14-17G (days off for police officers); St. 1987, c. 589 (collective bargaining binding arbitration for police). The United States Court of Appeals for the First Circuit has recognized a lessened expectation of privacy for police officers. See *O'Brien* v. *DiGrazia,* 544 F.2d 543, 546 (1st Cir. 1976) (public interest in honest police force outweighs Boston police officers' privacy expectations concerning their financial affairs and the financial affairs of their households), cert. denied, 431 U.S. 914 (1977). This court, too, has recognized a limitation on police officers' privacy expectations. See *Broderick* v. *Police Comm'r of Boston,* 368 Mass. 33, 42 (1975), quoting *Gardner* v. *Broderick,* 392 U.S. 273, 277-278 (1968) ("police officer 'is directly, immediately, and entirely responsible to the city or State which is his employer. . . . He is the trustee of the public interest, bearing the burden of great and total responsibility to his public employer' "), cert. denied, 423 U.S. 1048 (1976). The majority opinion, while recognizing that the police cadet in *O'Connor* v. *Police Comm'r of Boston,* 408 Mass. 324 (1990), had little or no reasonable expectation of privacy, fails to examine or consider any limitation on the expectation of privacy of the police officers in this case.

What is reasonable in terms of an expectation of privacy may also change over time. Not so long ago, many people might have been appalled, as is the majority, by the specter of drug testing, but the times have changed. It is now estimated that sixty percent of our country's largest private employers have drug testing programs. Comment, "Reasonable Searches Absent Individualized Suspicion: Is There a Drug-Testing Exception to the Fourth Amendment Warrant Requirement After *Skinner* v. *Railway Labor Executives' Association*? 12 U. Haw. L. Rev. 345, 349 (1990). "[W]hat is occurring generally outside government is some indication of what expectations of privacy 'society is prepared to accept as reasonable' . . . ." *Willner* v. *Thornburgh,* 928 F.2d 1185,

1192 (D.C. Cir. 1991), quoting *Katz* v. *United States*, 389 U.S. 347, 361 (1967), petition for cert. filed, 60 U.S.L.W. 3302 (1991) (No. 91-448). Additionally, I have found no court decision since decisions of the Supreme Court on drug testing, *National Treasury Employees Union* v. *Von Raab*, 489 U.S. 656 (1989), *Skinner* v. *Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989), that supports the majority opinion. See *McCloskey* v. *Honolulu Police Dep't*, 71 Haw. 568, n.1 (1990), and cases cited.

The majority opinion apparently considers only the other side of the balancing test, the alleged lack of facts within the record to support a compelling governmental interest. In *Commonwealth* v. *Trumble*, 396 Mass. 81 (1985), however, we recognized that this court can take notice of "a strong public interest." *Id.* at 86. In *Trumble*, that public interest was "reducing the 'carnage caused by drunk drivers.' " *Id.* at 86-87, quoting *South Dakota* v. *Neville*, 459 U.S. 553, 558 (1983). This court has also recently taken notice of the public interest in stemming drug use by police: "[D]rug use by police officers has the obvious potential, inimical to public safety, and the safety of fellow officers, to impair the perception, judgment, physical fitness, and integrity of the users. Furthermore, the unlawful obtaining, possession, and use of drugs cannot be reconciled with respect for the law. Surely, the public interest requires that those charged with responsibility to enforce the law respect it. Surely, too, public confidence in the police is a social necessity and is enhanced by procedures that deter drug use. . . ." *O'Connor* v. *Police Comm'r of Boston*, 408 Mass. 324, 328-329 (1990). It is nearly impossible to reconcile the reasoning in *O'Connor* with today's majority's opinion. The majority now appears to accept the conclusion of the concurring opinion in *O'Connor*, *id.* at 332 (Greaney, J., concurring), that it was the consent of the police cadet that made that drug test reasonable. The majority, apparently, would limit drug testing by the State to situations in which the individual consents to the test, and would restrain the State from protecting the public from the

dangers of drug abuse by police officers until the damage is done, until the public is harmed, and until it is too late.

For all these reasons, I dissent.


LYNCH, J. (dissenting). I agree with Justice O'Connor, *post*, that today's decision overrules *O'Connor* v. *Police Comm'r of Boston, supra*, and write separately only to reiterate my views concerning the application of the balancing test the court formulated in *Commonwealth* v. *Shields*, 402 Mass. 162 (1988), and *Commonwealth* v. *Trumble*, 396 Mass. 81 (1985). Simmered down to its essence, the court's decision stands for the proposition that police officers who carry guns and are employed in an extremely stressful environment are entitled to a greater protection of their privacy than are the average law abiding citizens of the Commonwealth, who happen to engage in their peaceful pursuits on our public highways. See *Commonwealth* v. *Trumble, supra.* To paraphrase what I said in *Horsemen's Benevolent and Protective Ass'n, Inc.* v. *State Racing Comm'n*, 403 Mass. 692, 710 (1989) (Lynch, J., dissenting), I would willingly sacrifice the drug testing of police officers for the right of citizens to be free from warrantless seizure absent probable cause or reasonable suspicion. Since I do not have that option, the illusive standards of the court's balancing test lead me to a contrary result.


O'CONNOR, J. (dissenting). By today's decision, the court effectively and unwisely overrules *O'Connor* v. *Police Comm'r of Boston*, 408 Mass. 324 (1990). In the process, the court not only displays ambivalence about whether a balancing of interests test is ever an appropriate standard for protecting art. 14 rights, *ante* at 333-334, contrary to the court's approach in *O'Connor*, but also retreats from its assessment in that case of the significance of the public interest in discovering and deterring drug use by police officers.

In *O'Connor*, the issue on appeal was whether suspicionless urinalysis testing of police cadets was unreasonable in the art. 14 sense. The issue in the present case is the same except that the present case relates not to police cadets but to police officers. In *O'Connor*, four members of the court reasoned that resolution of the question of reasonableness required the court to balance the government's need for the search and seizure against the procedure's intrusiveness into the plaintiff's reasonably expected privacy. In adopting that approach, which requires analysis of "all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself," *Skinner* v. *Railway Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989), quoting *United States* v. *Montoya de Hernandez*, 473 U.S. 531, 537 (1985), the four Justices expressly followed the lead taken by the United States Supreme Court in *National Treasury Employees Union* v. *Von Raab*, 489 U.S. 656, 665 (1989), and by the Supreme Judicial Court in *Horsemen's Benevolent & Protective Ass'n, Inc.* v. *State Racing Comm'n*, 403 U.S. 692, 704 (1989), *Commonwealth* v. *Shields*, 402 Mass. 162, 164 (1988), and *Commonwealth* v. *Trumble*, 396 Mass. 81, 88-90 (1985). *O'Connor, supra* at 327-328. Indeed, the four Justices made the point that, "despite their disclaimer," the three concurring Justices also "engaged in a balancing of the cadets' interest against that of the public employer." *Id.* at 329. I continue to believe that any determination of whether a search or seizure is constitutionally unreasonable necessarily depends on a balancing of the competing public and private interests in all the relevant circumstances. The court cites no case from any jurisdiction holding otherwise.

The court would distinguish *O'Connor* from this case on the ground that "in the *O'Connor* case . . . the police cadet had consented to the search, and therefore, he had little or no reasonable expectation of privacy," while, under Boston Police Department Rule 111, no consent is contemplated. *Ante* at 331. By that observation, the court implies, if it does not expressly state, that, regardless of the reasonableness of requiring a cadet to consent to urinalysis testing as a condi-

tion of eligibility for the cadet training program, such "consent" results in the cadet's having little or no interest protectable by art. 14. Therefore, there is no private interest against which the public interest would have to be balanced. The suggestion is that, in *O'Connor*, the nonexistence of any significant protectable interest of the plaintiff cadet made unnecessary any genuine consideration of the public interest in the discovery and deterrence of drug use by police cadets. Therefore, the court suggests, *O'Connor* should not be read as expressing the court's reasoned conclusion that the public has such an interest. The court then purports to balance the competing public and private interests in this case, in which pre-employment consent was not required, as though the court were operating on a clean slate.

The court is not operating on a clean slate. The court is wrong when it implies that the critical factor in the *O'Connor* decision was the cadet's pre-employment consent and not the court's reasoned conclusion that the public has a very substantial interest in drug-free police cadets. The court is wrong because "public employment may not be 'conditioned upon the surrender of constitutional rights which could not be abridged by direct government action.' " *Broderick* v. *Police Comm'r of Boston*, 368 Mass. 33, 37 (1975), cert. denied sub nom. *Broderick* v. *DiGrazia*, 423 U.S. 1048 (1976), quoting *Keyishian* v. *Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 605 (1967). In recognition of that principle, the court was careful to say in *O'Connor*, *supra* at 329, that "[s]urely, the plaintiff would not be barred from relief if his consent to be the subject of a search and seizure were unreasonably required as a condition of employment." Thus, the cadet's required pre-employment consent in *O'Connor* had little impact on that decision. The consent was virtually meaningless unless the consent requirement was "reasonable." Whether the consent requirement was reasonable in turn depended on balancing the public need for the testing procedure against the cadet's privacy interest — the same type of art. 14 analysis that would have been required without the consent. The fact is that, although

the cadet's consent was "a factor that diminishe[d] the degree of intrusiveness," *O'Connor, supra* at 328, primarily because it put him on notice, the cadet's "consent," which was exacted as a condition of employment, was not the critical factor in *O'Connor*; the public interest was.

In a very real sense, the intrusion wrought by Rule 111 is far less serious than the intrusion considered acceptable by the court in the *O'Connor* case. In *O'Connor*, the testing procedure called for the cadets to be visually observed by department officers while urinating, a procedure that is surely highly intrusive. Monitoring is not called for by Rule 111. As United States District Court Judge Keeton noted: "The amendment of Section 9 of Rule 111 was aimed at protecting privacy, and it is undisputed that it rendered moot those arguments previously advanced on grounds of invasion of privacy because of requirements (which appeared in the rule before amendment) that the police officer be observed during urination." *Guiney* v. *Roache*, 654 F. Supp. 1287, 1294 (D. Mass. 1987).

Furthermore, "it is plain that certain forms of public employment may diminish privacy expectations even with respect to such personal searches" as urinalysis tests. *National Treasury Employees Union* v. *Von Raab, supra* at 671. As the Supreme Court said in that case with respect to Customs employees, "[w]e think Customs employees who are directly involved in the interdiction of illegal drugs or who are required to carry firearms in the line of duty . . . have a diminished expectation of privacy in respect to the intrusions occasioned by a urine test. Unlike most private citizens or government employees in general, employees involved in drug interdiction reasonably should expect effective inquiry into their fitness and probity. Much the same is true of employees who are required to carry firearms. Because successful performance of their duties depends uniquely on their judgment and dexterity, these employees cannot reasonably expect to keep from the Service personal information that bears directly on their fitness. . . . While reasonable tests designed to elicit this information doubtless infringe some privacy expec-

tations, we do not believe these expectations outweigh the Government's compelling interests in safety . . . ." (Citation omitted.) *Id.* at 672. The Court's observations apply with equal force to police officers.

Finally, the court's statement in *O'Connor, supra* at 328-329, concerning the public interest in discovering and deterring drug use by police cadets, was correct when it was made, is correct now, and fits the present case: "Drug use is often difficult to discern. Yet, drug use by police officers has the obvious potential, inimical to public safety and the safety of fellow officers, to impair the perception, judgment, physical fitness, and integrity of the users. Furthermore, the unlawful obtaining, possession, and use of drugs cannot be reconciled with respect for the law. Surely, the public interest requires that those charged with responsibility to enforce the law respect it. Surely, too, public confidence in the police is a social necessity and is enhanced by procedures that deter drug use by police cadets." Furthermore, there should be no doubt "that drug abuse is one of the most serious problems confronting our society today. There is little reason to believe that American workplaces [including police departments] are immune from this pervasive social problem." *National Treasury Employees Union* v. *Von Raab, supra* at 674. No further proof of public necessity ought to be required.

If, as the court held in *O'Connor*, the public interest in discovering and deterring drug use by police cadets made the requirement of a cadet's consent to urinalysis testing reasonable, and made the subsequent urinalysis testing reasonable as well, even though intrusive monitoring was involved in that procedure, a requirement that permanent police officers submit to unmonitored urinalysis testing is also reasonable. It is strange indeed that, in the *O'Connor* case, the court recognized the public interest in discovering and deterring drug use by cadets, but now it fails to recognize the same public interest or a greater one in discovering and deterring drug use by permanent police officers whose conduct has impact on public safety, police safety, law enforcement, and public

confidence much more than does the conduct of cadets. I would affirm the judgment below.