# United States Court of Appeals
## For the First Circuit

No. 15-2015

RONNIE JONES; RICHARD BECKERS; WALTER R. WASHINGTON; WILLIAM E. BRIDGEFORTH; SHAWN N. HARRIS; EUGENE WADE; GEORGE C. DOWNING, JR.; CLARARISE BRISTOW; MASSACHUSETTS ASSOCIATION OF MINORITY LAW ENFORCEMENT OFFICERS; RACHELLE COUCH; KERI HOGAN,

Plaintiffs, Appellants,

v.

CITY OF BOSTON; BOSTON POLICE DEPARTMENT; WILLIAM B. EVANS, Commissioner of the Boston Police Department,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Kayatta, Circuit Judges.

Lisa J. Pirozzolo, with whom Jared B. Cohen, Jeffrey S. Olshan, Wilmer Cutler Pickering Hale and Dorr LLP, Iván Espinoza-Madrigal, Oren M. Sellstrom, Laura Maslow-Armand, and Lawyers' Committee for Civil Rights and Economic Justice were on brief, for appellants.

Stephen S. Churchill and Fair Work, P.C. on brief for Fair Employment Project, National Workrights Institute, Jewish Alliance for Law and Social Justice, Massachusetts Law Reform Institute, Boston Society of Vulcans of Massachusetts, Union of Minority Neighborhoods, Massachusetts Employment Lawyers Association, Brazilian Worker Center, Massachusetts Black Lawyers Association,

Fair Housing Center of Greater Boston, and Community Change, Inc., amici curiae.

Michael L. Foreman and Pennsylvania State University, Dickinson School of Law, Civil Rights Appellate Clinic on brief for National Employment Lawyers Association, Equal Justice Society, Justice at Work, and American Civil Liberties Union of Massachusetts, amici curiae.

Helen G. Litsas, with whom Law Office of Helen G. Litsas was on brief, for appellees.

December 28, 2016

**KAYATTA**, **Circuit Judge**.  Making their second appearance before this court are eight police officers, a police cadet, and a provisionally hired 911 operator (collectively, the "Officers"), who claim that they suffered adverse employment actions by the Boston Police Department ("Department") as a result of a racially discriminatory hair drug test.  Eschewing any claim that the Department discriminated against them intentionally, the Officers advance a so-called disparate impact claim under Title VII of the Civil Rights Act of 1964.  See 42 U.S.C. § 2000e-2(k). Adjudicating the question of liability under such a claim begets a three-prong, sequential inquiry.  See Lopez v. City of Lawrence, 823 F.3d 102, 110-11 (1st Cir. 2016).  In our prior opinion, we held that the Officers--all of whom identify as black--had established under the first prong of that inquiry that the hair drug test caused a cognizable disparate impact.  See Jones v. City of Boston ("Jones I"), 752 F.3d 38, 60 (1st Cir. 2014). We remanded the case to the district court to consider the next two prongs by determining, either on summary judgment or after trial, as appropriate:  (1) whether the Department's drug testing program was job related and consistent with business necessity; and, if so, (2) whether the Department refused to adopt an available alternative that would have met the Department's legitimate needs while having less of a disparate impact.

- 3 -

On remand, the district court again entered summary judgment for the Department, concluding that the evidence could not support a jury verdict for the Officers on either of the remaining prongs of the disparate impact liability inquiry. We now vacate that judgment, albeit only in part. Although the drug test was indisputably job related and its use was consistent with business necessity, a reasonable factfinder could nevertheless conclude that the Department refused to adopt an available alternative to the challenged hair testing program that would have met the Department's legitimate needs while having less of a disparate impact. Our reasoning follows.

## I. Background

Our prior opinion details much of the relevant factual background. See Jones I, 752 F.3d at 42–46. In a nutshell, from 1999 to 2006, the Department administered a hair drug test to thousands of officers, cadets, and job applicants. The testing procedure called for the gathering of a hair sample, which was then "washed" and analyzed for the presence of cocaine, marijuana, opiates, PCP, and amphetamines. Upon detecting cocaine in a hair sample, a licensed physician would determine whether legally administered medication could have caused the positive result. The individual who tested positive was also permitted to submit a second sample for a so-called "safety-net" test.

- 4 -

The results were negative for over 99% of the white individuals tested and over 98% of the black individuals tested. The Officers now before us, however, were among the fewer than two percent of black individuals who tested positive for cocaine. As a result, nine lost a job or job offer, and one received an unpaid suspension subject to participation in a drug rehabilitation and testing program.

In the first go-around, the district court relied on a rule of thumb promulgated by the U.S. Equal Employment Opportunity Commission ("EEOC") to declare that there was no actionable disparate impact, because the one-percent difference in pass rates between white and black officers was so miniscule as to be of no practical significance. We, in turn, found the EEOC rule of thumb not controlling. See id. at 52. Instead, because the difference in exam results by race was indisputably statistically significant, we concluded that the Officers prevailed as a matter of law on the first prong of the three-prong disparate impact inquiry. Id. at 60. On remand, the case was randomly assigned to a new district court judge in accord with the district's customary practice.

In short order, the parties marshalled their evidence, mostly in the form of competing expert opinions concerning the reliability of the test, together with affidavits from the Officers denying drug use. In a lengthy and attentive opinion, the district

court found that no reasonable jury could rule in favor of the Officers on either of the two remaining prongs. Specifically, the court found that the Department "demonstrated . . . the business necessity and job relatedness of the hair drug test," Jones v. City of Boston, 118 F. Supp. 3d 425, 440 (D. Mass 2015), and that the Officers failed to offer "any compelling evidence of the [Department's] refusal to consider and adopt an alternative equally valid procedure," id. at 446. The Officers appeal both findings.

## II. Discussion

Ruling on a motion for summary judgment, the district court was required to assume that any disputes of material fact--including conflicting opinions offered by competent experts--could be resolved by the jury in the Officers' favor. See Cortés-Irizarry v. Corporación Insular de Seguros, 111 F.3d 184, 191 (1st Cir. 1997). On appeal, we must also so assume, see Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145, 153 (1st Cir. 2009), and we consider the summary judgment ruling de novo, Martinez v. Petrenko, 792 F.3d 173, 179 (1st Cir. 2015).

## A. Job-Relatedness and Consistency with Business Necessity

We consider first whether a reasonable jury could find that the Department's use of the hair drug test to terminate or suspend officers was "job related . . . and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). The parties

agree that "abstention from drug use is an important element of police officer behavior," and is thus job related. The Officers also quite understandably concede that selecting police officers for retention or discharge based on that job-related behavior is consistent with business necessity. The pivotal question, therefore, is whether a reasonable jury could nonetheless find that the hair drug test as used by the Department was so unreliable that its use did not meaningfully further the Department's legitimate need for a drug-abstaining police force. See Jones I, 752 F.3d at 54 (suggesting that the hair test would have to be "so unreliable that its results have no significant correlation with drug use"); see also Lopez, 823 F.3d at 111 ("[A] selection practice is valid if it materially enhances the employer's ability to pick individuals who are more likely to perform [their jobs] better than those not picked." (emphasis added)).

Certainly, the evidence would allow a reasonable jury to find that the hair test as employed by the Department was not 100% reliable because (according to the Officers' experts) it could not always distinguish between ingestion of drugs and contamination of the hair by environmental exposure to drugs. The Officers' experts further testified that this inability to distinguish unerringly between ingestion and exposure could well have caused the disparate impact because, at the margins, black hair, especially if damaged by some cosmetic treatments more commonly used by black

- 7 -

individuals, is more likely to absorb and retain contaminants to which the hair might be exposed.

So far, so good for the Officers. The problem, though, is that a finding that all of the test's few positive results might not have accurately distinguished between ingestion and exposure logically falls short of establishing that using the test to move towards a drug-abstaining police force did not further the Department's important needs. To evaluate the reliability of the hair drug test in this context, one must consider the test as a whole and the relative numbers of errors among both the positive and negative results.

The Department employs thousands of officers. It would like to know which officers abstain from drug use and which do not. As best the record reveals--and no party argued otherwise to the district court--the negative hair test results were all accurate. This means that the hair test was accurate in the overwhelming majority of cases, reliably confirming that almost all officers, irrespective of race, very likely abstained from using the tested-for drugs within as many as ninety days prior to the test. This undisputed high degree of accuracy is far beyond what we have recently and repeatedly indicated satisfies the employer's burden of proving that a challenged employment practice furthers an important need of the employer. See Jones I, 752 F.3d at 54; see also Lopez, 823 F.3d at 111. It also eliminates any

reason to look at the technical guidance for assessing job relatedness promulgated by the EEOC.  See Lopez, 823 F.3d at 112.

Of course, unless the test was 100% accurate at distinguishing exposure from ingestion, obtaining a drug-abstaining police force in this manner could well have been unfair to some of the few officers who received positive results.[1]  As we will discuss, this potential unfairness was the focus of a state administrative "just cause" adjudication.  The second prong of the disparate impact inquiry, though, focuses only on the reliability of the test in meeting the employer's needs.  See Albemarle Paper Co. v. Moody, 422 U.S. 405, 431 (1975).  And as we have previously stated, see Lopez, 823 F.3d at 119, there is no reason why a test need be anything near 100% reliable (few tests are) to be consistent with business necessity (keeping in mind that the presence of an alternative method that would have had less of a disparate impact will still be relevant under the third prong of the inquiry).

Notwithstanding the foregoing reasoning, the Officers argue that a ruling in 2013 by the Massachusetts Civil Service Commission ("MCSC") collaterally precludes the Department from claiming that the hair test was job related and consistent with business necessity.  In that ruling, the MCSC overturned most (but

_____

[1] The Officers do not claim that all of the positive results were inaccurate.

not all) of the Officers' dismissals, determining that a positive hair test was insufficiently reliable by itself to establish just cause for termination by a preponderance of the evidence. Both the Massachusetts Superior Court, see Bos. Police Dep't v. Civil Serv. Comm'n, Nos. 13-1250-A & 13-1256-A, slip op. at 20–21 (Mass. Super. Ct. Oct. 6, 2014), and the Massachusetts Court of Appeals, see Thompson v. Civil Serv. Comm'n, 59 N.E.3d 1185, 1190 (Mass. App. Ct. 2016), have since affirmed the MCSC's conclusions regarding the reliability of the positive results generated by the hair drug test.

We review the applicability vel non of issue preclusion de novo. Monarch Life Ins. Co. v. Ropes & Gray, 65 F.3d 973, 978 (1st Cir. 1995). A party advocating for issue preclusion must show (among other things) that "the issues raised in the two actions are the same" and "the determination of the issue was necessary to that judgment." Manganella v. Evanston Ins. Co., 700 F.3d 585, 591 (1st Cir. 2012). "The identity of the issues need not be absolute; rather, it is enough that the issues are in substance identical." Id. (citing Montana v. United States, 440 U.S. 147, 155 (1979)).

The issue before the MCSC was whether a positive test result by itself was just cause for terminating a tenured public employee. That is simply not an issue in this case. The Officers nevertheless point out that the MCSC made a subsidiary finding

- 10 -

that the positive results failed to show that drug ingestion was more likely than not. There is nothing in this finding, though, that conflicts with the district court's central conclusion that use of the hair drug test furthered the Department's legitimate need to have a police force comprised of officers who abstain from using the tested-for drugs. Indeed, the MCSC expressly stated that the test "has a legitimate place in narrowing down which of its few officers may reasonably be suspected of abusing illicit drugs." This statement supports, rather than precludes, the district court's conclusion that the use of the drug test furthered a significant employer need. The MCSC parted company with the district court only to the extent that the MCSC was required to ask a further question not germane to the district court's inquiry, i.e., whether a reasonable suspicion of illicit drug use was "just cause" for terminating a tenured public employee.

We therefore agree with the district court that the record in this case (even including the MCSC's findings) renders unreasonable any claim that the Department has not proved that its use of the hair test was job related and consistent with business necessity.

## B. Refusal to Adopt Available Alternative that Would Have Met Employer's Legitimate Needs with Less Disparate Impact

Our conclusion that a reasonable jury would have to find that the hair drug test was job related and consistent with

business necessity does not mean that it was necessarily lawful to use the disparately impactful test. Rather, it brings us to the third and final prong of the disparate impact liability inquiry: whether the evidence could support a jury finding that the Department nevertheless "refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." Ricci v. DeStefano, 557 U.S. 557, 578 (2009) (citing 42 U.S.C. § 2000e-2(k)(1)(A)(ii), (C)). Application of this prong in this case turns on the answers to three questions: First, does the record contain evidence that would allow a jury to find that there was an "alternative" method of meeting the Department's legitimate needs? Second, does the record also allow a jury to find that adopting that alternative method would have had less of a disparate impact? And finally, could a jury find that the Department "refuses to adopt" that alternative method? We consider each question in turn.

> **1. Could a reasonable jury find that an alternative drug-testing method would have met the Department's legitimate needs?**

With relatively little explanation or elaboration, the Officers' opening brief offers four proposed alternatives to the hair drug test, only one of which it subsequently contends the Department refused to adopt even though it would have been equally effective in meeting the Department's needs and less disparately impactful. The parties refer to that alternative as "hair testing

- 12 -

plus urinalysis."  By this, the Officers mean the following:
first, administer the hair test to all officers (which will clear
over 98% of the individuals tested); then, administer a follow-up
series of random urinalysis tests only to those officers who
receive positive results on the hair test; and discharge (or
suspend, pending rehabilitation and further drug testing) only
those who flunk one of the follow-up random urinalysis tests.[2]

This approach would have fully replicated the results of
the hair test alone except, a jury might find, it would have
cleared those who received a positive hair test yet were likely
not using cocaine.  And if the urinalysis tests continued randomly
over the course of more than ninety days, they would have confirmed

---

[2] The district court found that the Officers failed to show
that use of urinalysis testing in lieu of hair testing would have
sufficed.  Urinalysis detects only very recent cocaine use (within
two days), whereas hair testing detects cocaine use for a much
longer period (within as many as ninety days).  If urinalysis were
administered frequently enough to all officers, it might be
prohibitively expensive.  See Watson v. Fort Worth Bank & Tr., 487
U.S. 977, 998 (1988) (plurality opinion) ("Factors such as the
cost or other burdens of proposed alternative selection devices
are relevant in determining whether they would be equally as
effective as the challenged practice in serving the employer's
legitimate business goals.").  Particularly if it were
administered on thousands of occasions, urinalysis might be easier
to tamper with.  And as a more intrusive test (especially if done
in a manner that avoids tampering), its use without individualized
suspicion might well be legally problematic.  See Guiney v. Police
Comm'r, 582 N.E. 2d 523, 526-27 (Mass. 1991).  The Officers concede
little of the foregoing, but nevertheless do not press on appeal
the substitution of urinalysis as an alternative to hair testing.

a period of drug abstention equal to that confirmed by a negative hair test.

Would this alternative have equally met the Department's needs? A reasonable jury might so find. Keep in mind that the Department already used a series of negative urinalysis tests as a basis to reinstate suspended officers who tested positive on the hair test: officers who tested positive on the hair test under the challenged practice could choose to admit to drug use; receive a forty-five day unpaid suspension; undergo drug rehabilitation; and submit to frequent, random urinalysis for three years. The only difference between the challenged practice and the proposed "hair testing plus urinalysis" alternative is that firing (or suspension and drug rehabilitation) preceded the urinalysis testing in the actual regime, whereas no change in employment status would have occurred until after urinalysis confirmation in the alternative scheme. Additionally, Department policy has long permitted supervisors with a reasonable suspicion that an officer is using drugs to order urinalysis screening of that officer. That the Department used urinalysis in these scenarios--where officers had already tested positive for drugs or were reasonably suspected of using drugs--naturally suggests that the Department viewed random urinalysis as an acceptably reliable method for detecting

drug use on a targeted (rather than mass) basis.[3]  To the extent that a concern with urinalysis is its manipulability, a jury could find that the more frequent and randomized nature of the Officers' proposed urinalysis program would have sufficiently minimized such a concern.[4]

Crucially, the alternative would have retained the main benefit of the challenged drug testing program:  using a relatively unintrusive, easy-to-supervise hair test to generate the negative results that confirm that almost all officers, regardless of race, do not use illegal drugs.  All in all, we think that this is a close enough call that a jury could conclude that the Officers' proffered alternative equally would have met the Department's needs.  Indeed, if a jury believed the thrust of the Officers' evidence, it might conclude that the alternative test method would have saved the Department from losing several veteran officers who were not using cocaine.

---

[3] Similarly, while it may be within the scope of inquiry to consider the putative costs of the Officers' proposed alternative, see Watson, 487 U.S. at 998 (plurality opinion), a reasonable jury could find that there would have been no material cost differential, especially given that the Department had shown a willingness to assume those costs by virtue of the rehabilitation option that it offered (and continues to offer) to all officers who tested positive on the hair test.

[4] We note that the challenged hair test program itself was not intended to catch all use of illegal drugs.  Rather, the aim was to ensure that there was at least a sixty- to ninety-day period of abstention.

## 2. Could a reasonable jury find that the alternative would have generated less of a disparate impact?

In Jones I, we observed that "[a] plaintiff who subjects a defendant's job-related practice to the sensitivity of a large sample analysis can fairly be required to show through statistical evidence, and with equal confidence, that the proffered alternative practice will have a smaller impact, except where the alternative is self-evidently incapable of causing a differential." 752 F.3d at 53. The Department reads this statement as always requiring a new, large-sample statistical analysis that specifies the precise impact of an alternative practice. We reject this overly narrow reading of the manner by which statistical evidence can be marshalled. Rather, the plaintiff in some situations can use the statistically determined impact of the challenged process as a baseline, and demonstrate that the alternative practice must necessarily be less. Suppose, for example, that an employer selected job applicants by height, creating a disparate gender impact revealed through a large-sample statistical analysis. If the proposed alternative were to use a random selection tool (such as a coin flip), it would be self-evident that the impact would be less; hence, there would be no need for actually running the numbers through a new analysis.

Here, if the jury were to believe the Officers and their experts rather than the Department and its experts, it would be

self-evident that the "hair testing plus urinalysis" alternative would have generated less of a disparate impact than that revealed by the large-sample statistical analysis of the hair drug test results.  The jury could find that the hair test alone can generate false positives for some black individuals, that black individuals have no greater likelihood of receiving a false positive result from urinalysis than do white individuals,[5] and that the Officers (who swear that they did not use cocaine) more likely than not received false positive results that urinalysis would have identified as such.  Given such findings, the alternative would necessarily have resulted in the termination of a lower ratio of black officers to white officers.  That is, because the statistical analysis of the challenged practice shows an overall disparate impact of X, where the number of black officers with positive results was Y, a reduction in Y alone would necessarily have resulted in an overall disparate impact of less than X.

None of this is to say that the jurors must so find. The jury could conclude, for example, that the hair test as administered by the Department did not generate false positives based on race, and hence, that the alternative would not have had a lesser disparate impact.  The point is that, though the evidence is conflicting, the mathematical import of either conflicting view

---

[5] This point is undisputed.

is self-evident.  A jury could therefore find that the Officers' proposed alternative would have had less of a disparate impact than that resulting from the challenged practice.

### 3.    Could a reasonable jury find that the Department "refuses" to adopt the alternative?

Title VII requires as an element of a successful disparate impact claim a finding that "the [employer] refuses to adopt such alternative employment practice."  42 U.S.C. § 2000e-2(k)(1)(A)(ii).  This language is susceptible to a number of different readings.  Does an employer only "refuse to adopt" an alternative practice if the employer knows it will meet its needs and have less of a disparate impact?  If this were a correct reading, then a finding for plaintiffs on the third prong of the disparate impact inquiry would effectively constitute a finding of intentional discrimination.  Cf. Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 660-61 (1989) (observing that a refusal to adopt an alternative "would belie a claim by petitioners that their incumbent practices are being employed for nondiscriminatory reasons"), superseded by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074; Albemarle Paper Co., 422 U.S. at 425 ("Such a showing would be evidence that the employer was using its tests merely as a 'pretext' for discrimination.").  As we have previously observed, however, "proof of a disparate impact claim

requires no proof of intentional discrimination."  Jones I, 752 F.3d at 50; see also Ricci, 557 U.S. at 583.

Other possible readings of the statute remain.  Is it enough that the alternative was available and not used, or must its availability have been known?  Must it be specifically proposed, like a dinner special at a restaurant, or is it enough that it was on the known menu of options and not selected?  What are we to make of the statute's use of the present tense ("refuses")?  The parties provide no express discussion of these nuances.  Indeed, their briefs contain no acknowledgement that there are meaningfully different possible readings of the statutory text.  The only cases upon which the Officers rely are the Seventh Circuit's decisions in Adams v. City of Chicago, 469 F.3d 609 (7th Cir. 2006), and Allen v. City of Chicago, 351 F.3d 306 (7th Cir. 2003).  The Department, too, urges us to follow the Seventh Circuit, pointing specifically to Allen.  The formulation employed in Allen and repeated in Adams is that "the statutory scheme requires plaintiffs to demonstrate a viable alternative and give the employer an opportunity to adopt it."  Adams, 469 F.3d at 613 (quoting Allen, 351 F.3d at 313).  Adams elsewhere seems to suggest that the employer is given an opportunity to adopt the alternative if the employer "had an opportunity" to adopt it, see id. at 613, 616, and that such an "opportunity" existed if the

alternative was "available," see id. at 614, and the employer was free to adopt it, see id. at 615 n.4.

Confronted with the limited briefing on point, and the parties' consensus in pointing to Seventh Circuit precedent, we will follow the path of Allen and Adams by default (rather than by decision). We asked at oral argument whether there was evidence in the record that the "hair testing plus urinalysis" alternative was available to the Department at a time relevant to this lawsuit. The Officers' counsel directed us only to the fact that in 2003, they gave the Department an affidavit signed by their expert, Dr. Kidwell, proposing the alternative. This affidavit by Dr. Kidwell is the same evidence on which plaintiffs relied in the district court. The affidavit appears to be an expert disclosure detailing Dr. Kidwell's opinions on hair testing as well as "more enlightened approach[es] to drug testing," which include hair testing followed by random, frequent urinalysis. It is dated June 3, 2003. Plaintiffs' "Additional Statement of Material Facts" states that "[a]s early as 2003, Dr. Kidwell suggested alternative methods" of testing for drug use to the Department, pointing to this affidavit as evidence of the fact. The Officers make no claim that the alternative was otherwise "available" before Dr. Kidwell proposed it. Exactly when in 2003 the suggestion was made is not revealed. We infer that it was when the affidavit was served on the Department's counsel sometime that year. In any event, the

affidavit does indeed propose that the Department could use what we refer to as the "hair testing plus urinalysis" alternative.

Accordingly, we agree with the Officers that the summary judgment record reveals a material dispute of fact concerning whether, sometime in 2003, the Department, by continuing to administer the challenged hair test, "necessarily . . . refused to adopt" the alternative made available to it by the suggestion of Dr. Kidwell. See Ricci, 557 U.S. at 589. The parties appear to agree that some (but not all) of the Officers were selected for termination or suspension after Dr. Kidwell submitted his affidavit to the Department in 2003. Those Officers, but not the others, could succeed at trial under the third prong of the disparate impact inquiry. Precisely which Officers' claims survive based on this timeline can be determined in the district court on remand.

### III. Conclusion

In sum, we affirm the district court's ruling on summary judgment that the Department's use of the hair test was job related and consistent with business necessity, but we vacate the district court's grant of summary judgment to the Department on the third prong of the disparate impact inquiry. The record contains sufficient evidence from which a reasonable factfinder could conclude that hair testing plus a follow-up series of random urinalysis tests for those few officers who tested positive on the

hair test would have been as accurate as the hair test alone at detecting the nonpresence of cocaine metabolites while simultaneously yielding a smaller share of false positives in a manner that would have reduced the disparate impact of the hair test. We also think that, on the present record, a reasonable factfinder could conclude that the Department in 2003 refused to adopt this alternative. We remand for further proceedings consistent with this opinion. The district court will decide at the time of final judgment whether costs of this appeal are to be shifted in favor of a finally prevailing party under any applicable statute.