USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1502

 THOMAS O'BRIEN, ETC., ET AL.,

 Plaintiffs, Appellants,

 v.

 MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,

 Defendant, Appellee.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. George A. O'Toole, Jr., U.S. District Judge]

 Before

 Selya, Circuit Judge,
 
 Coffin and Campbell, Senior Circuit Judges.
 
 

 John M. Becker, with whom Sandulli, Grace, Shapiro, Horwitz &
Davidson, P.C. was on brief, for appellants.
 H. Reed Witherby, with whom Smith & Duggan LLP was on brief,
for appellee.

December 4, 1998

 
 SELYA, Circuit Judge. Wrapping their claims securely in
the mantle of federalism, Thomas O'Brien and Edward O'Malley
protest an order of the district court which, in effect, allows
their employer, the Massachusetts Bay Transportation Authority
(MBTA), to continue random drug and alcohol testing of transit
police. We affirm.
 I
 Background
 Most constituencies regard the Urban Mass Transportation
Act, more recently dubbed the Federal Transit Act, 49 U.S.C. 
5301-5330, 5332-5338, 10531 (the Transit Act), as a boon; after
all, it provides eligible state and local governments with generous
funding for qualified public works projects. The MBTA, a political
subdivision of the Commonwealth of Massachusetts, see Mass. Gen.
Laws, ch. 161A, 2, has long availed itself of the Transit Act's
bounty. Since 1965, it has applied for and received funding to the
tune of approximately $3 billion under this statutory scheme. The
beat goes on: as of June 30, 1995, the MBTA was engaged in $1
billion worth of ongoing capital projects, 80% funded by the
federal government under the auspices of the Transit Act.
 Federal subsidies often have strings attached, and monies
disbursed pursuant to the Transit Act are no exception. One such
string emanates from requirements contained in the Omnibus
Transportation Employee Testing Act of 1991, Pub. L. No. 102-143,
105 Stat. 952, that Congress has made applicable to mass transit
employers. See 49 U.S.C. 5331 (the Testing Act). A core
provision of the Testing Act requires the Secretary of
Transportation to develop a program that, inter alia, directs
recipients of the federal government's Transit Act largesse to
conduct random drug and alcohol testing of "mass transportation
employees responsible for safety-sensitive functions." Id. at 
5331(b)(1)(A). The Secretary permissibly defines "safety-sensitive
functions" to include those that involve "carrying a firearm for
security purposes." 49 C.F.R. 653.7, 654.7. Recipients of
federal aid for mass transit projects must abide by the
requirements of the Testing Act and the regulations promulgated
thereunder (including the requirement for random drug and alcohol
tests). Failure to adhere strips a recipient of its eligibility
for federal financial assistance. See 49 U.S.C. 5331(g).
 The MBTA is subject to the constraints of the Testing Act
by reason of its continued application for, and receipt of, grants
under the Transit Act. To comply with this statutory obligation,
the MBTA inaugurated a program requiring MBTA police officers to
submit to random drug and alcohol screens. This protocol did not
gain accolades in all quarters. O'Brien and O'Malley, acting
individually and in their respective official capacities as
presidents of the MBTA Police Patrol Officers' Association and the
MBTA Police Sergeants' Association, brought suit in the Suffolk
Superior Court seeking declaratory and injunctive relief. They
averred that the MBTA's policy violated their rights under both
federal law and the Massachusetts Declaration of Rights (the MDR). 
The state court granted a preliminary injunction on the ground that
Article 14 of the MDR, as interpreted in Guiney v. Police Comm'r,
411 Mass. 328, 582 N.E.2d 523 (1991), likely precluded enforcement
of the testing protocol. In arriving at its conclusion, the court
rejected the notion of federal preemption, stating its disbelief
that the MBTA, "by voluntarily applying for and accepting Federal
funds, can then eviscerate an employee's state constitutional
rights because Congress has attached a condition to those funds."
 The MBTA seasonably removed the action to the federal
district court. See 28 U.S.C. 1331, 1441. Although the state
court's injunction remained in effect for the time being, seeGranny Goose Foods, Inc. v. Brotherhood of Teamsters, Etc., Local
No. 70, 415 U.S. 423, 436 (1974), it did not last very long. In
fairly short order, the district court granted partial summary
judgment in the MBTA's favor, concluding that federal law preempted
any contrary provision of state law. The court dissolved the
preliminary injunction shortly thereafter. This appeal ensued. We
have jurisdiction under 28 U.S.C. 1292(a)(1) (conferring
appellate jurisdiction to review interlocutory orders "granting,
continuing, modifying, refusing or dissolving injunctions").
 II
 Analysis
 A.
 Preemption
 The vast majority of preemption cases involve situations
in which Congress has exercised its power under the Commerce
Clause. See Laurence H. Tribe, American Constitutional Law 6-29,
508 (2d ed. 1988). Here, however, we are dealing with a
congressional exercise of the spending power, not the commerce
power, and the dynamics between preemption and Congress's reliance
on the spending power differ appreciably from those applicable in
the Commerce Clause context. The principal difference is that
whereas preemptive legislation enacted under the Commerce Clause
trumps state law throughout the United States ex proprio vigore,
preemptive legislation enacted under the spending power presents
states with a choice: they may either accept federal funds (and
subject themselves to requirements imposed by federal law) or
decline such funds (and avoid the necessity of abiding by those
requirements). See Golden State Transit Corp. v. City of Los
Angeles, 493 U.S. 103, 112 (1989); see also Pennhurst State Sch. &
Hosp. v. Halderman, 451 U.S. 1, 17 (1981) (Pennhurst I) (stating
that "legislation enacted pursuant to the spending power is much in
the nature of a contract: in return for federal funds, the States
agree to comply with federally imposed conditions").
 Thus, if this were a situation in which the federal
sovereign had invoked the spending power to justify preemption over
the laws of a state that had eschewed federal funds, we could not
dismiss lightly the state court's intuition about the awkwardness
of asserting preemption solely on the basis of Congress's exercise
of that power. In this case, however, the MBTA did not refuse to
accept federal mass transit money, but, rather, willingly tapped
into the federal fisc (and, as far as we can tell, intends to
continue accepting federal funds for the indefinite future). When
Congress delineates conditions governing the receipt of federal
dollars and a state agency accepts the money on that basis, the
Supremacy Clause requires conflicting local law to yield. See CSX
Transp., Inc. v. Easterwood, 507 U.S. 658, 663-64 (1993); Lawrence
County v. Lead-Deadwood Sch. Dist. No. 40-1, 469 U.S. 256, 269-70
(1985); Blum v. Bacon, 457 U.S. 132, 145-46 (1982); Carleson v.
Remillard, 406 U.S. 598, 601 (1972); Townsend v. Swank, 404 U.S.
282, 286 (1971); Helvering v. Davis, 301 U.S. 619, 645 (1937);
Amalgamated Transit Union, Local Div. 589 v. Commonwealth of Mass.,
666 F.2d 618, 627 (1st Cir. 1981) (Breyer, J.). The rule, then,
is crystal clear: as long as a state receives federal funds for a
particular purpose, its law, if contrary to conditions attached to
the funds, must give way to federal law.
 That brings the finish line into sight. It cannot be
gainsaid that the most obvious cases for federal preemption occur
when Congress has expressly declared its intent. See, e.g.,
Barnett Bank of Marion County v. Nelson, 517 U.S. 25, 31 (1996);
Greenwood Trust Co. v. Commonwealth of Mass., 971 F.2d 818, 822
(1st Cir. 1992). The Testing Act supplies a classic example of
this species of legislative expression. It unambiguously provides
that "[a] State or local government may not prescribe, issue, or
continue in effect a law, regulation, standard, or order that is
inconsistent with regulations prescribed under this section." 49
U.S.C. 5331(f)(1). That message is reinforced by the
regulations. See 49 C.F.R. 653.9, 654.9. The plain language
of these provisions bespeaks "conflict preemption," see, e.g.,
Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 (1984), which means
that the only remaining question here is whether state law either
contradicts applicable federal law or frustrates the objects that
federal law seeks to promote, see, e.g., Boggs v. Boggs, 117 S. Ct.
1754, 1760-61 (1997).
 This question is easily answered. There can be no doubt
that the MDR, as interpreted by the state superior court and by the
plaintiffs, conflicts with the requirements imposed by federal law. 
Quite simply, the state court's preliminary injunction (premised on
its reading of state law) prevented the MBTA from conducting the
random drug and alcohol testing that federal law (namely, the
Testing Act) requires recipients of federal Transit Act funds to
sponsor. Moreover, contrary to the state court's intimation, it is
of no moment that in this instance a federal law supplants a state
constitutional as opposed to a statutory or regulatory 
provision. Such a result is exactly what the letter of the
Supremacy Clause demands. See U.S. Const., Art. VI, cl. 2
(mandating that federal law "shall be the supreme Law of the Land
. . ., any Thing in the Constitution or Laws of any State to the
Contrary notwithstanding"). Thus, we unhesitatingly affirm the
district court's conclusion that federal law has preemptive force
in this situation.

 B.
 Conforming Conduct to State Law
 In this venue, the plaintiffs shift their emphasis. They
maintain that, even if section 5331(f)(1) binds the MBTA to follow
the Testing Act's directive as long as it continues to receive
federal financial assistance, the injunction nonetheless should
remain in force. To support this proposition, they embellish their
original claim. Instead of arguing simply that federal law lacks
preemptive effect and that the MDR forbids the MBTA from conducting
random tests, the plaintiffs assert that the MBTA should be
precluded from applying for federal funds in the first place,
because accepting such funds will create an inevitable conflict
with state law. The paramount problem with this argument there
are others which we need not discuss is that it invites a federal
court to enjoin state officials (those who manage the MBTA) from
acting in a manner that allegedly contravenes state law.
 It is not the proper purview of a federal court to
supervise state officials' compliance with state law. See ANR
Pipeline Co. v. Lafaver, 150 F.3d 1178, 1188-89 (10th Cir. 1998);
LaShawn A. by Moore v. Barry, 144 F.3d 847, 852 (D.C. Cir. 1998);
Archie v. City of Racine, 847 F.2d 1211, 1216 (7th Cir. 1988) (en
banc). As Justice Powell observed, "it is difficult to think of a
greater intrusion on state sovereignty than when a federal court
instructs state officials on how to conform their conduct to state
law." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106
(1984) (Pennhurst II). Hence, we decline the plaintiffs'
invitation to cross this line. 
 Relatedly, we note the anomaly inherent in the
plaintiffs' position. Although we take no view on the requirements
of Massachusetts law, it is difficult to fathom, as an abstract
matter, how forcing a state agency to forgo billions of dollars in
federal subsidies would render its hierarchs more accountable to
the citizenry or how such a step would profit the agency's
workforce in the long run. Were Massachusetts to renounce federal
funds in order to save the plaintiffs from the indignity of random
drug and alcohol tests, the Commonwealth then would have only four
options (to be used singly or in combination): it could raise
taxes to fill the budgetary gap, transfer funds from some other
line in the budget, lay off MBTA employees to curtail expenses, or
cease all construction and improvements relating to mass transit. 
None of these alternatives strikes us as attractive from the
standpoint of the workers whom O'Brien and O'Malley represent. 
More important, though, if such dire remedies are to be
implemented, that is a decision for Massachusetts to make, not one
for a federal court to impose. Cf. Missouri v. Jenkins, 495 U.S.
33, 50-51 (1990) (holding that a federal court's order for a local
tax increase violated principles of comity).

 C.
 The Scope of the Protocol
 The plaintiffs have a final shot in their sling. They
asseverate that the district court should not have dissolved the
injunction completely because the MBTA's testing policies exceed
the requirements set forth in the federal regulations (and to that
extent are not within the prophylaxis of section 5331(f)(1)). They
claim, for example, that the MBTA's alcohol screening standard is
twice as strict as that mandated by federal law and that the MBTA
tests for more substances than federal law specifies. The MBTA
disputes the accuracy of these charges and states that its protocol
faithfully tracks federal requirements.
 We need not resolve this contretemps. To the extent that
the plaintiffs claim that exceeding federal testing requirements,
without more, violates federal law, they are mistaken. It is not
enough to aver that the MBTA's protocol differs from the federal
prototype. From the viewpoint of federal preemption, differences
are not significant unless they conflict with federal law in a
manner that somehow frustrates the purposes behind that law. SeeHayfield N. R.R. Co. v. Chicago & N.W. Transp. Co., 467 U.S. 622,
627 (1984) (holding that the Supremacy Clause "invalidates any
state law that contradicts or interferes with an Act of Congress"). 
Here, the plaintiffs fail to demonstrate any material dissonance
between the Testing Act and the MBTA's protocol. Indeed,
regulations promulgated under the Testing Act contemplate the
possibility that a state may enact tougher requirements and they
do not preclude a state from doing so. See 49 C.F.R. 653.25(i)
(recognizing the possibility that an employer may implement an
anti-drug program that tests for more than the five controlled
substances specified by the Testing Act regulations); see also id.at 653.11 (preventing employers from adopting additional measures
only if such measures would frustrate the purposes of the Testing
Act, as elucidated in the applicable regulations).
 Nor can the plaintiffs rewardingly recast their thesis. 
To the extent that they are claiming that a federal court should
grant injunctive relief (or leave such relief intact) because
certain provisions in the MBTA's protocol, not compelled by federal
law, violate state law, this argument is merely a reprise of the
argument that we previously rejected. See Part II(B), supra. In
short, the plaintiffs again ask us to conform the MBTA's testing
protocol to what they contend are the requirements of state law. 
Pennhurst II forbids us from honoring this request.

 III
 Conclusion
 We need go no further. Massachusetts authorities have
elected to draw on federal coffers to finance a bevy of mass
transit projects. Having accepted those funds, they must abide by
the conditions that Congress attached to them, one of which
mandates random drug and alcohol screens for employees who, like
the plaintiffs, perform safety-sensitive functions. Because
applicable federal law includes an express preemption provision,
contrary state law cannot stand as an obstacle to the testing
protocol. Moreover, to the extent that the plaintiffs claim that
the MBTA's initial decision to seek federal funding transgressed
state law, they are attempting to press their claim in a forum in
which it is not properly cognizable.

 The order dissolving the preliminary injunction is
affirmed. Costs to appellee.